# United States Court of Appeals

*for the*

# First Circuit

Case No. 24-1518

29 GREENWOOD, LLC,

*Plaintiff-Appellant,*

v.

CITY OF NEWTON; NEWTON HISTORICAL COMMISSION; MAYOR RUTHANNE FULLER, individually and in her official capacity; DOUG CORNELIUS, individually and in his official capacity; PETER DIMOND, individually and in his official capacity; KATY HOLMES, individually and in her official capacity; JOHN LOJEK, individually and in his official capacity; ANTHONY CICCARIELLO, individually and in his official capacity,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, BOSTON, IN CASE NO. 1:23-cv-10800-FDS, BEFORE THE HONORABLE ALLISON DALE BURROUGHS, UNITED STATES DISTRICT JUDGE

## BRIEF FOR PLAINTIFF-APPELLANT

THOMAS H. CURRAN
BRIAN J. LEFORT
THOMAS H. CURRAN ASSOCIATES, LLC
*Counsel for Plaintiff-Appellant*
75 State Street, Suite 100
Boston, Massachusetts 02109
(617) 207-8670

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................ ii

I.    JURISDICTIONAL STATEMENT .............................................. 1

II.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ................... 1

III.  STATEMENT OF THE CASE ................................................ 2

      A.    RECITATION OF MATERIAL FACTS ................................. 2

      B.    PROCEDURAL HISTORY .......................................... 12

IV.   SUMMARY OF THE ARGUMENT ........................................ 13

V.    ARGUMENT .......................................................... 14

      A.    DISTRICT COURT IMPROPERLY CONSIDERED
            MATTERS OUTSIDE THE PLEADINGS AND MADE
            FACTUAL FINDINGS THAT LED IT TO DISMISS THE
            COMPLAINT .................................................. 14

      B.    29 GREENWOOD SUFFICIENTLY ALLEGED A
            REGULATORY TAKING IN VIOLATION OF THE 5TH
            AMENDMENT TO THE UNITED STATES
            CONSTITUTION AND MASS. GEN. LAWS ch. 79 § 10 .............. 19

      C.    COMPLAINT PLAUSIBLY ALLEGED A VIOLATION OF
            MASSACHUSETTS' CIVIL RIGHTS ACT, MASS.
            G. L. c. 12, §11I .......................................... 27

            There Is No Qualified Immunity for Appellees ............... 34

      D.     EXCESSIVE FINES CLAIM IS RIPE FOR
            ADJUDICATION .............................................. 38

V.    CONCLUSION ........................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Agins v. City of Tiburon*,
447 U.S. 255 (1980) ...................................................................21

*Anderson v. Creighton*,
483 U.S. 635 (1987) ...................................................................35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................15

*Asociacion de Subscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*,
484 F.3d 1 (1st Cir. 2007) ..........................................................37

*Ayasli v. Armstrong*,
56 Mass. App. Ct. 740 (2002) .....................................................35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................15

*Bell v. Mazza*,
394 Mass. 176 (1985) ................................................... 29, 33, 35

*Blair v. Department of Conservation & Recreation*,
457 Mass. 634 (2010) .................................................................36

*Brett v. Building Comm'r of Brookline*,
250 Mass. 73 (1924) ...................................................................29

*Buster v. George W. Moore, Inc.*,
438 Mass. 635, 783 N.E.2d 399 (2003).................................. 29, 31

*Cheffer v. Reno*,
55 F.3d 1517 (11th Cir. 1995)................................................ 39, 40

*City of Las Vegas v. 180 Land Co.*,
546 P.3d 1239 (2024)............................................................ 18, 22

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
526 U.S. 687 (1999) ...................................................................23

*Deas v. Dempsey*,
403 Mass. 468 (1988) .................................................................31

*Foley v. Wells Fargo Bank, N.A.*,
772 F.3d 63 (1st Cir. 2014) ..................................................................16

*Freeman v. Planning Bd. of West Boynton*,
419 Mass. 548, 646 N.E.2d 139 (1995)................................................28

*Guilfoile v. Shields*,
913 F.3d 178 (1st Cir. 2019) ................................................................15

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ............................................................................35

*Haufler v. Zotos*,
446 Mass. 489 (2006) .................................................................... 29, 35

*Holcim – NER, Inc. v. Town of Swampscott*,
671 F. Supp. 3d 84 ................................................................. 18, 25, 26

*Holman v. City of Warrenton*,
242 F. Supp. 2d 791 (D. Or. 2002) ................................................ 18, 22

*Huntly USA Corp. v. United States*,
525 F.3d 1370 (Fed. Cir. 2008)............................................................21

*Jesus Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*,
915 F.3d 256 (4th Cir. 2019)................................................................15

*Kennie v. Natural Resources Dep't. of Dennis*,
451 Mass. 754 (2008) .................................................................. passim

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987) ............................................................................26

*Lingle v. Chevron USA Inc.*,
544 U.S. 528 (2005) ...................................................................... 21, 26

*Lucas v. S.C. Coastal Counsel*,
505 U.S. 1003 (1992) ................................................................ 21, 25, 37

*Maine Educ. Ass'n Benefits Tr. v. Cioppa*,
695 F.3d 145 (1st Cir. 2012) ........................................................ 24, 25

*Mitchell v. Forsyth*,
472 U.S. 511 ......................................................................................35

*Murphy v. Duxbury*,
40 Mass. App. Ct. 513, 665 N.E.2d 1014 (1996) .................................31

*Murr v. Wisconsin*,
  582 U.S. 383 (2017) ..........................................................................21

*Palazzolo v. Rhode Island*,
  533 U.S. 606 (2001) ..........................................................................20

*PDCM Associates, SE v. Quinones*,
  2016 WL 8711711 (D.P.R. 2006) ......................................................37

*Penn Central Transp. Co. v. New York City*,
  438 U.S. 104 (1978) .............................................................. 21, 24, 37

*Pennsylvania Coal Co. v. Mahon*,
  260 U.S. 393 (1922) ..........................................................................36

*Pheasant Ridge Assoc. Ltd. Partnership v. Town of Burlington*,
  399 Mass. 771 (1987) .............................................................. 34, 35

*Philip Morris v. Reilly*,
  312 F.3d 24 (1st Cir. 2002) ..............................................................18

*Planned Parenthood League of Mass., Inc. v. Blake*,
  417 Mass. 467 (1994) ........................................................................31

*Rodriguez–Ortiz v. Margo Caribe, Inc.*,
  490 F.3d 92 (1st Cir.2007) ................................................................15

*SBT Holdings, LLC v. Town of Westminster*,
  547 F.3d 28 (1st Cir. 2008) ..............................................................15

*Sherman v. Town of Chester*,
  752 F.3d 554 (2d Cir. 2014) ................................................... 18, 22, 25

*Sierra Club v. Khanjhee Holding (US) Inc.*,
  655 F.3d 699 (7th 2011) ...................................................................38

*Stevens v. City of Columbus*,
  2021 WL 3562918 (S.D. Ohio 2021) ................................................39

*Swanset Dev. Corp. v. Taunton*,
  423 Mass. 396 .....................................................................................29

*Tai Tam v. Missoula County*,
  410 Mont. 465, 520 P.3d 312 (2022) ....................................... 19, 22

*Thyng v. City of Quincy*,
  32 Mass. L. Rptr. 215 (Super. Ct. 2014) ................................... 30, 32

*Tortora v. Inspector of Buildings of Tewksberry*,
    41 Mass. App. Ct. 120 (1996)................................................................35

*Walsh v. Town of Lakeville*,
    431 F. Supp. 2d 134 (D. Mass. 2006)....................................................36

*Whiting v. Maiolini*,
    921 F.2d 5 (1st Cir. 1990) ......................................................................16

*Wilson v. Commonwealth*,
    31 Mass. App. Ct. 757 (1992)................................................................23

**Statutes & Other Authorities:**

U.S. Const. Amend. V ................................................................... *passim*

U.S. Const. Amend. VIII ............................................................... *passim*

U.S. Const. Amend. XIV ....................................................................20

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1337 .................................................................................1

1 E. Coke, Institutes, ch. 1, Sec. 1 (1st Am. Ed. 1812)....................25

Fed. R. App. P. 4(a) ............................................................................1

Fed. R. Civ. P. 4(m) ..........................................................................27

Fed. R. Civ. P. 12 ..............................................................................16

Fed. R. Civ. P. 12(b)(5) .....................................................................27

Fed. R. Civ. P. 12(b)(6) ............................................................. *passim*

Fed. R. Civ. P. 12(d) .........................................................................16

Mass. G.L. ch. 12, § 11I.................................................................1, 27

Mass. G.L. ch. 79, § 10 .............................................................1, 19, 29

Massachusetts Declaration of Rights, Article 1 ..........................29, 31

Massachusetts Declaration of Rights, Article 10 ........................29, 31

Massachusetts Declaration of Rights, Article 12 ........................29, 31

Newton Revised Ordinances § 22-60 ........................................................2

Newton Revised Ordinances § 22-66 ......................................................11

Newton Revised Ordinances § 22-66(a) .................................................12

Newton Revised Ordinances § 22-72 ......................................................12

Newton Revised Ordinances, Ch. 17, Article III, § 17-23......................12

# I. JURISDICTIONAL STATEMENT

This case asserts claims arising under the 5th and 8th Amendments to the United States Constitution, U.S.Const. Amends 5, 8; Massachusetts G.L. ch. 79, § 10; the Massachusetts Civil Rights Act, Mass. G.L. c. 12 § 11I; and Massachusetts common law. The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. Jurisdiction in the court of appeals is proper under 28 U.S.C. § 1291. The notice of appeal was timely filed on May 24, 2024, less than 30 days after the district court issued its April 30, 2024, Order from which this appeal is taken. *See* Fed.R.App.P. 4(a). The Order and Judgment were final and disposed of all claims.

# II. STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the district court erred when it considered matters outside the pleadings on a motion to dismiss under F.R.C.P. 12(b)(6) and made factual determinations that led it to dismiss appellant's Takings Clause claim.

2. Whether the district court erred when it concluded appellant's complaint failed to raise a plausible claim for violation of the Takings Clause of the 5th Amendment to the United States Constitution, U.S.Const. Amend 5, and Massachusetts G.L. ch. 79, § 10.

3. Whether the district court erred when it concluded appellant's complaint failed to raise a plausible claim for violation of the Massachusetts Civil Rights Act, Mass. G.L. c. 12 § 11I.

4. Whether the district court erred when it dismissed appellant's claim for violation of the Excessive Fines Clause of the 8th Amendment to the

United States Constitution, U.S.Const. Amend 8, because the claim was not ripe for determination.

## III.  STATEMENT OF THE CASE

## A. RECITATION OF MATERIAL FACTS

In January, 2021, 29 Greenwood, LLC ("Appellant" or "29 Greenwood") purchased a residential parcel of property located at 29 Greenwood Street, Newton, Massachusetts (the "Property").  It paid a purchase price of $1,150,000.00.  On the Property sits the Gershon Hyde House, which was constructed around 1744, (the "Structure").  This Structure has historic importance and was designated a Newton Local Landmark in 2005.  Jt. Appx. [hereinafter, "J.A."] at 15, ¶¶ 29, 30.

In 2017, pursuant to the procedures set forth in the Newton Landmark Ordinance[1], 29 Greenwood's predecessor-in-interest submitted applications to the Newton Historical Commission ("NHC" or the "Commission") and Inspectional Services Department ("ISD") to undertake an extensive renovation of the structure, which was substantially deteriorated, uninhabitable and in a dangerous condition due to a lengthy period of neglect.  J.A. at 15, 17, ¶¶ 33, 38, 39.  The prior owner submitted to the City of Newton (the "City") elaborate plans that described in detail the work to be undertaken to restore and preserve the Structure.  *Id.* at 17-18, ¶¶ 39, 42, 43.  This included a deconstruction and reconstruction of the existing

[1] Newton Revised Ordinances, §§ 22-60, *et seq.*

2

dwelling, including repairing and replacing every element of the existing dwelling structure, from the framing to the sheathing, roofing, foundation, siding, windows, doors and trim. *Id.* at 17-18, ¶¶ 39, 42. The extensive work was necessitated by the severely dilapidated condition of the Structure.[2] *Id.* at 15, 16, 18, ¶¶ 33, 35, 36, 43.

The Newton Historic Commission voted unanimously in favor of a Certificate of Appropriateness ("COA") based upon the plans duly submitted by the Property's former owner. J.A. at 17-18, ¶¶ 38, 41. The NHC renewed the COA in subsequent years, and it remained in effect when 29 Greenwood purchased the Property. *Id.* at 18, ¶ 41.

In February of 2021, after it acquired the Property, 29 Greenwood began to undertake the very work that its predecessor had proposed, and the City had approved in issuing him the COA. J.A. at 18, ¶ 46. 29 Greenwood also undertook costly efforts to preserve every element of the dwelling that was salvageable so that these could be reincorporated into the restored structure, including all exterior and interior walls, sheathing, framing, windows, doors, floorboards and every other component that could be saved and reused in the reconstructed structure. *Id.* at 19, 21, ¶¶ 47, 60. 29 Greenwood even suspended in air the salvageable components of

---

[2] The plans also contemplated demolition and significant addition to the rear portion of the property. J.A. at 18, ¶ 42.

the interior framing so that it could be preserved as the foundation was poured. *Id.* at 21, ¶ 60. *At no time during the deconstruction and reconstruction of the dwelling did 29 Greenwood exceed or otherwise violate the scope of work as was contemplated by the COA. Id.* at 17-8, 25-6, 29, 32, 49-50, 52, ¶¶ 39, 43, 46, 83, 84, 102, 117, 212, 219, 226. Nor did 29 Greenwood, at any time, "demolish" any portion of the structure (other than the rear portion that had been approved for demolition.) The Town's ISD Inspector Gilbert made regular visits to the construction site, and never expressed any concern that 29 Greenwood was breaching the COA or otherwise acting beyond the scope of the approved plans. *Id.* at 10, 23, ¶¶ 10, 67.

As the work was progressing, the Town's Chief of Planning, Katie Hax Holmes ("Hax Holmes"), curiously, became preoccupied with 29 Greenwood's plans for the Property – specifically whether 29 Greenwood intended to resell it for a profit after construction was completed. On March 15, 2021, she sent an email to 29 Greenwood inquiring whether that was its intent. J.A. at 22, ¶ 64. Around this time, Hax Holmes also phoned 29 Greenwood's realtor, posing as an interested purchaser, to determine 29 Greenwood's intent. *Id.* During the course of their conversation, Hax Holmes began yelling at the realtor and revealed her true identity. Hax Holmes indicated that she was offended by 29 Greenwood's intent to

resell the Property. She informed 29 Greenwood that under no circumstances would the project be allowed to go forward. *Id.* at 22, ¶ 65.

As deconstruction proceeded, members of the public began lodging complaints to the City about the project. J.A. at 24-5, 27, 29, 31, ¶¶ 75, 76, 83, 92, 98, 111. Most likely these individuals did not understand the nature of the work 29 Greenwood was undertaking, and perhaps thought it was not intending to restore the home. The local press, as well, published negative news articles concerning the project. *Id.* at 24, ¶ 75. The City inexplicably posted the negative news articles on its public website. *Id.*

On April 29, 2021, Hax Holmes emailed NHC Chairman Cornelius, ISD Commissioner Lojek, and Ciccariello, falsely accusing 29 Greenwood of tearing down the structure. J.A. at 22, ¶ 66. Tellingly Hax Holmes did not include inspector Gilbert in the email. *Id.* Again Gilbert – who had direct knowledge of the progress of the reconstruction and never asserted that 29 Greenwood was out of compliance with the COA or was otherwise in breach of approved plans -- was in a position to refute Hax Holme's contention. *Id.* at 23, ¶ 67. The following day the City issued 29 Greenwood a stop work order, forcing the cessation of the reconstruction. *Id.* at 23, ¶ 68.

On May 26, 2021, ISD Commissioner Lojek opined that 29 Greenwood's work was within the scope of the plans NHC approved. J.A. at 25, ¶ 77. Hax Holmes responded that Lojek was "an ass." *Id.* at 25, ¶78.

At a public meeting held on May 27, 2021, in order to placate angry members of the public who were pressuring it to shut down the project, the NHC voted to prevent 29 Greenwood from conducting any further work on the Structure. J.A. at 25, ¶ 83. In support of its motivation for the vote, NHC falsely contended that 29 Greenwood's partial demolition of the rear of the Structure – which was explicitly authorized under the COA – was beyond the scope of what was permissible. *Id.* NHC also voted to impose fines on 29 Greenwood in the amount of $300 a day, retroactive to April 30, 2021. *Id.*

Immediately after this meeting, NHC members Dimond and Cornelius, and Planner Hax Holmes engaged in a colloquy over their personal emails, discussing ways in which NHC could prevent 29 Greenwood from completing the project and selling the Property. Dimond suggested that NHC could stymie 29 Greenwood by,

> "[R]equire[ing] that the historic house be partially restored to serve as an educational reminder of what had been there, *but not completed to be a habitable structure*. In that way, it continues to fall under NHC jurisdiction *but is not able to be sold as a home or buildable land*…If the developer refuses to carry out our orders, the City can move the issue to Superior Court. Eventually the City could take the property…".

(emphasis added). J.A. at 26, ¶ 85. Cornelius responded stating

> "...Right now the developer is stuck with a property *he can't do anything with* and it is costing him $300 per day…I intend to make it hard…We don't have to do anything at this point…*Time is on our side*."

(emphasis added.) *Id.* at 26-7, ¶¶ 86, 88.

On June 4, 2021, Hax Holmes inquired of Commissioner Lojek whether ISD could "ban the issuance of any building permit on [the Property] for two years." J.A. at 27, ¶ 90.

In the meantime, members of the public continued to send letters and emails to the City protesting against the project. These included entreaties that NHC reject all proposals to develop the Property. J.A. at 27, ¶ 92. Hax Holmes forwarded the letters and emails to a City staffer, along with a message that it would be "awesome" if the staffer could post the negative missives on the City's website for all to see. The staffer responded to Hax Holmes that her message could be perceived as biased against 29 Greenwood. J.A. at 29, ¶ 99.

In October, the Mayor of Newton chimed in and expressed her own bias against 29 Greenwood, informing a constituent that "I am committed to pursuing legal measures against this developer." J.A. at 31, ¶ 112.

Rather than pursuing litigation against NHC for its arbitrary revocation of its right to develop the Property under the existing COA, 29 Greenwood opted to take a conciliatory approach to the situation. J.A. at 28, 31, ¶¶ 97, 113. It still believed that the Commission was acting in good faith, as it was then unaware of the bias

and hostility members had privately expressed towards 29 Greenwood and the project undertaken by it. *Id.* On August 11, 2021, 29 Greenwood submitted to the NHC an extensive package of information outlining how it intended to pursue the project. *Id.* at 28, ¶¶ 93-96. At a subsequent public meeting, on August 26th, 29 Greenwood's architect gave a lengthy presentation explaining the project. *Id.* at 29-30, ¶¶ 101, 102, 103. Rather than act on the submission, the NHC insisted that 29 Greenwood submit additional information and another complete set of architectural plans. *Id.* at 30, ¶ 106.

On October 6, 2021, 29 Greenwood provided NHC with everything that it had asked for at the previous meeting. J.A. at 30, ¶¶ 107, 108. NHC responded that 29 Greenwood needed to submit additional information. *Id.* at 31, ¶ 109. 29 Greenwood dutifully provided NHC with what it requested. *Id.*

On October 28, 2021, the NHC held another public meeting to review 29 Greenwood's submissions. J.A. at 32, ¶ 116. At the meeting, appellee Dimond, who had by then become chairman of the NHC, recommended the Commission vote against 29 Greenwood's plans because they reflected work that 29 Greenwood had performed pursuant to the approved COA, and because they ostensibly did not conform to the Secretary of Interior Standards for Treatment of Historic Properties.

*Id.* at 32-3, ¶ 117, 120.  However, NHC had *never adopted* such standards[3] and thus they were not applicable.  *Id.* at 33, ¶ 120.  Dimond summarily concluded that the project was "not realistic" and that he did not need to see anything more from 29 Greenwood.  *Id.* at 33, ¶ 120. The NHC thereafter not only voted to reject 29 Greenwood's submission, but *also to revoke its previous approval for the rear addition* – without any explanation.  *Id.* at ¶ 121.

Thereafter, the Commission demanded that 29 Greenwood submit information it had already provided in its previous two submissions.  J.A. at 34, ¶ 125.  Confounded by NHC's repetitive requests, 29 Greenwood's architect wrote to the City's Chief Preservation Planner, reiterating that the requested information had already been supplied.  *Id.* At that point the architect questioned the NHC's motives for its inexplicable requests, and opined that officials were acting out of emotion to block progress on the project.  *Id.*

In the Spring of 2022, Mayor Fuller continued to write to angry constituents that she shared their outrage towards the 29 Greenwood, and was committed to pursuing, "to the fullest extent", legal action against it.  J.A. at 35, ¶ 126.

On April 20, 2022, the Commission again demanded that 29 Greenwood resubmit information that it had already supplied in previous submissions.  J.A. at

---

[3] The NHC had not required appellant's predecessor to conform to these standards when it issued the COA. J.A. at 38, ¶ 145.

35, ¶¶ 127, 128. Notwithstanding, 29 Greenwood once again cooperated and submitted the information sought. *Id.* at 35, ¶ 129. On April 28, 2022, 29 Greenwood submitted revised plans to the Commission that eliminated the rear addition to the Structure, as NHC had demanded. *Id.* at 35, ¶ 130. Once again, 29 Greenwood's architect gave another lengthy presentation regarding the submission. *Id.* at 35, ¶ 132. NHC refused to make a determination on the submission. Rather, it demanded yet more information from 29 Greenwood. *Id.* at 36, ¶ 133.

On May 24, 2022, NHC Chairman Dimond emailed the other members of the Commission – evading open meetings law – expressing his opinion that any further submission by 29 Greenwood must "show a detailed budget sheet *show[ing] no profit*." (Emphasis added). J.A. at 36, ¶¶ 135, 136.

On May 27, 2022, 29 Greenwood submitted yet another set of plans and specifications to the NHC. J.A. at 37, ¶ 138. The Commission held another public meeting on the submission on August 2, 2022, at which meeting the Board rejected the plans, again based on alleged non-conformance with the Secretary of Interior standards that had never been adopted. *Id.* at 37, ¶ 139. On August 12, 2022 – more than fifteen months after issuing its total Stop Work Order and after numerous submissions and resubmissions – the NHC again rejected 29 Greenwood's plans. *Id.* at 37, ¶ 140. In its "Record of Action," the Commission proffered as reasons for the rejection not only that 29 Greenwood did not comply

with standards that were inapplicable, but based on several additional reasons that were, to a one, patently spurious and directly contrary to the information supplied by 29 Greenwood. *Id.* at 37, 38-43, ¶¶ 141, 143-180. Appellees never informed 29 Greenwood what it could do to reverse the stop work order. J.A. at 91-92, Transcript at 31-32.

By this point, it had become clear to 29 Greenwood that the Commission was stringing it along and that further submissions would be futile. The Commission's dilatory and inexplicable actions sent the clear message that it did not intend to permit 29 Greenwood to recommence reconstruction under any circumstances.

On February 16, 2023, 29 Greenwood filed the underlying lawsuit against the City and the individual appellees Mayor Ruthanne Fuller, Doug Cornelius, Peter Dimond, Katy Holmes, John Lojek, and Anthony Ciccariello (the "Individual Appellees" and collectively with the City, the "Appellees"). Almost immediately after learning of the lawsuit, the City filed a *criminal complaint* against 29 Greenwood in Massachusetts district court for alleged violation of a civil ordinance, specifically § 22-66[4] of the Landmark Ordinance. J.A. at 44, ¶ 187.

---

[4] That statute reads, in relevant part: "Except as this division may otherwise provide, unless the commission shall first have issued a certificate of appropriateness…no building, structure, exterior architectural feature or landscape of a landmark shall be altered or demolished nor any building or demolition permit

The Landmark Ordinance expressly states that enforcement of its provisions shall be through an equitable action filed in the Middlesex Superior Court. Newton Revised Ordinances, §22-72. In an affidavit attached to the criminal complaint, appellee Lojek falsely contended that 29 Greenwood demolished the Property. He asked for an award of $210,000.00 in civil fines. J.A. at 44, ¶ 187. *See* Newton Revised Ordinances, Ch. 17, Article III, § 17-23.

Appellees actions have left 29 Greenwood with a parcel of property that it can do nothing with. Without clearance to reconstruct the residence, the Property has no economically viable use and is unsaleable. J.A. at 32, 43, ¶¶ 115, 181. In light of the NHC actions and its intransigence, prospective buyers are no longer interested in purchasing the Property, as they had been prior to the NHC's obstructionist conduct. *Id.* at 49, ¶¶ 208, 210, 211.

## B. PROCEDURAL HISTORY

On February 16, 2023, 29 Greenwood brought suit against Appellees in Middlesex Superior Court, asserting Constitutional, statutory and common law claims arising out of Appellees' conduct. The case was subsequently removed to federal district court. On October 17, 2023, 29 Greenwood filed an amended and supplemented complaint (the "Complaint"). On November 7, 2023, Defendants

---

issued therefor by the city or any department thereof." Newton Revised Ordinances, § 22-66(a).

filed a Motion to Dismiss the Amended Complaint pursuant to F.R.C.P. 12(b)(6) (the "Motion to Dismiss"), which 29 Greenwood opposed. On April 30, 2024, the District Court granted Appellees' Motion to Dismiss and dismissed 29 Greenwood's amended complaint in its entirety. 29 Greenwood filed its Notice of Appeal on May 24, 2024 (the "Notice of Appeal").

## IV.  SUMMARY OF THE ARGUMENT

The district court improperly considered matters outside the pleadings in making its determination that 29 Greenwood's Complaint did not state a plausible takings claim. Citing extrinsic materials that the City and Individual Appellees attached to their Motion to Dismiss, the district court made factual determinations prejudicial to 29 Greenwood. These improper factual determinations served as the basis for the district court's conclusion that 29 Greenwood had not stated a takings claim. Hence, the court's consideration of extrinsic materials was harmful error.

Had it limited its consideration to the allegations in the Complaint, the district court would have been compelled to conclude that 29 Greenwood's Complaint sufficiently stated a constitutional and statutory takings claim. 29 Greenwood adequately pled that the City and the NHC engaged in a course of conduct that was arbitrary and spiteful and that was intended to and which actually did deprive it of all economically viable or productive use of its property. Therefore, 29 Greenwood adequately alleged both a categorical and noncategorical

taking of its property under controlling authority and the district court erred in finding otherwise.

The district court also erred in determining that the Complaint failed to allege a plausible claim for relief against the individual defendants under the Massachusetts Civil Rights Act. The Complaint adequately sets forth facts that establish each element of this claim. Further it contains facts that, accepted as true, vitiate qualified immunity for the individual defendants.

Finally, the district court erred in dismissing 29 Greenwood's claim arising under the Excessive Fines Clause of the 8th Amendment because it was ostensibly not ripe for resolution. The municipal appellees initiated a legal action to collect a sum certain in fines and that amount could not be lowered at the discretion of the state court. Therefore, the district court had before it concrete facts that enabled it to render a determination on this claim.

## V. ARGUMENT

### A. DISTRICT COURT IMPROPERLY CONSIDERED MATTERS OUTSIDE THE PLEADINGS AND MADE FACTUAL FINDINGS THAT LED IT TO DISMISS THE COMPLAINT.

Although in its Opinion and Order the District Court purported to dispose of the Complaint based upon a Rule 12(b)(6) standard of review, its Memorandum & Order reveals that it relied on matters outside the pleadings to reach its decision. This included appellees' attorney's *ipse dixit* and photographs attached to the

Motion to Dismiss. The Court then drew factual conclusions from these materials that served as its basis for dismissing 29 Greenwood's takings claims. This was harmful error and warrants reversal. This Court reviews decisions on F.R.C.P. 12(b)(6) motions *de novo*. *Guilfoile v. Shields*, 913 F.3d 178, 186-87 (1st Cir. 2019).

The purpose of a motion pursuant Rule 12(b)(6) is to test the sufficiency of the pleadings. When confronted with a motion to dismiss, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff. *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28 (1st Cir. 2008). Dismissal is only appropriate if the complaint, so viewed, fails to allege a "plausible entitlement to relief." *Rodriguez–Ortiz v. Margo Caribe, Inc.,* 490 F.3d 92, 95 (1st Cir.2007) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 559 (2007)). To this end, the pleader need not show that alternative explanations for the challenged conduct are less likely than their theory. *See Jesus Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019). "Rule 12(b)(6) does not countenance…dismissal based upon a judge's disbelief of complaint's factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009).

Where a movant attaches extrinsic material to its motion to dismiss, the court may consider it so long as the court converts the motion to dismiss into one for summary judgment, and gives the opposing party "a reasonable opportunity to

present materials pertinent to the motion." *See Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 73 (1st Cir. 2014); F.R.C.P. 12(d).  In such a case, the court must permit discovery.  *Foley*, 772 F.3d at 73.  "When discovery has not begun and the nonmovant has had no reasonable opportunity to obtain and submit additional evidentiary materials to counter the movant's evidence, conversion of a Rule 12 motion to a Rule 56 motion is inappropriate."  *Id.* (citing *Whiting v. Maiolini*, 921 F.2d 5, 7 (1st Cir. 1990)).

In this case, despite identifying the correct standard of review for a Rule 12(b)(6) motion, J.A. at 119 (Memorandum & Order at 11), the district court side-stepped that standard and considered both attorney *ipse dixit* and extrinsic materials filed by defendants in reaching its conclusion.  J.A. at 122, 124-25 (Memorandum & Order at pp. 14, 16, 17).  The court gave no notice nor other indication that it was converting the 12(b)(6) motion into a summary judgment motion; much less did it provide plaintiff with a reasonable opportunity to collect and present evidence to counter the Appellees' submissions, as 29 Greenwood was entitled per Rule 12(d).

The court's erroneous consideration of matters outside the pleadings led it to draw factual conclusions that were prejudicial to 29 Greenwood.  For example, the court accepted as true counsel's assertions on brief and during oral argument that 29 Greenwood had "demolished" the structure, and that pictures filed by

defendants depicted a "demolition." *See* J.A. at 122, 124-25; 79, 81-2 (Memorandum & Order at pp. 14, 16, 17; Transcript p. 19, 21-22). Importantly, nowhere in 29 Greenwood's Complaint had it averred that it demolished the Property. On the contrary, 29 Greenwood pled that it acted at all times within the scope of the duly issued COA. When the district court asked 29 Greenwood point blank at oral argument whether 29 Greenwood had demolished the Structure, 29 Greenwood responded, "that's not true." J.A. at 79 (Transcript at 19).

The district court's inappropriate consideration and lay interpretation of the meaning of the photographs, and its subsequent factual determination that 29 Greenwood had "demolished" the Property prejudiced plaintiff, because this determination led inexorably to the Court's conclusion that 29 Greenwood did not plausibly allege a taking. Specifically, in accepting the demolition as a fact, the court concluded that 29 Greenwood violated the COA, and that the actions attributed to Appellees were simply a routine administrative response to such a violation. It opined that 29 Greenwood could not have a reasonable, investment-backed expectation that it could demolish the home and build a structure according to its whim. So characterized, the court concluded there was no plausible claim for a taking.

Had it not presumed a demolition, but limited its inquiry to the four corners of the Complaint, the district court would be constrained to view the Appellees'

actions in a totally different light.  In the absence of a putative demolition that breached the COA, there was no justification for Appellees' conduct.  In that case their actions – from the stop work order to the multiple denials of 29 Greenwood's submissions for spurious and pretextual reasons – was an abuse of power that served to effectuate Appellees' expressed desire to prevent 29 Greenwood from completing the project at all.  That left 29 Greenwood with a parcel of property with no viable economic or productive use, something it could never have anticipated.  Such circumstances give rise to a plausible takings claim.  *See* Sec. IV-B, *infra*.  *See also, Holcim – NER, Inc. v. Town of Swampscott*, 671 F.Supp. 3d 84, 91 ("A regulatory taking may occur when a government actor places 'significant restriction' upon an owner's use of his or her property.") (citing *Philip Morris v. Reilly*, 312 F.3d 24, 33 (1st Cir. 2002)).  *See also Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014) (Town's actions in continuously delaying and obstructing plaintiff's petition to develop his property over the course of years prevented him from making any economic use of his property and effected a taking); *Holman c. City of Warrenton*, 242 F.Supp.2d 791 (D. Or. 2002) (City's arbitrary withdrawal of previously issued permit to develop property which was motivated by public sentiment against development stated a Takings Clause violation); *City of Las Vegas v. 180 Land Co.*, 546 P.3d 1239 (2024) (city's action in denying application for development based on pretextual reasons, coupled with

expressed animosity towards the project and acquiescence in public pressure to reject development, effected a taking); *Tai Tam v. Missoula County*, 410 Mont. 465, 520 P.3d 312 (2022) (where proposed subdivision complied with state law, but county frustrated development by insisting that plaintiff meet standards that were never adopted, county effected a taking of plaintiff's land).

In short, the court erred as a matter of law in considering extrinsic materials and making factual determinations adverse to 29 Greenwood based on such materials, and that error materially prejudiced the 29 Greenwood when it led the court to dismiss the case.

## B. 29 GREENWOOD SUFFICIENTLY ALLEGED A REGULATORY TAKING IN VIOLATION OF THE 5TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND MASS. GEN. LAWS ch. 79 § 10

The allegations in the Complaint and reasonable inferences that may be drawn therefrom plausibly allege a viable takings claim under both the 5th Amendment to the United States Constitution, and Mass. Gen. Laws ch. 79, § 10. The district court erred in determining otherwise.

29 Greenwood's Complaint recounts facts that, when taken as true, demonstrate a concerted and successful effort on the part of Appellees to divest 29 Greenwood's property of all economic value, so that it would eventually walk away from the project. At the time it purchased the Property, the Property had

been approved for reconstruction under the local Landmark Ordinance, and in consideration of this, 29 Greenwood paid a purchase price of $1,150,000.00. Upon acquiring the Property, 29 Greenwood set about undertaking the very reconstruction work that that the NHC had approved on 2017, 2019 and 2020. At all times 29 Greenwood remained compliant with the COA and the underlying scope of work. Capitulating to public pressure and motivated by their own animus against the project, Appellees forced 29 Greenwood to stop the reconstruction work, effectively rescinded 29 Greenwood's duly issued COA, conspired to prevent 29 Greenwood from restoring the Structure to habitable condition, then voted repeatedly to reject 29 Greenwood's attempts to restart the project based on pretextual and spurious reasons.

"The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (internal citation omitted). Although the "clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use," the Supreme Court has "recognized that there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs." *Id.* Such

actions are referred to as regulatory takings. *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017).

There are two types of regulatory takings: categorical and non-categorical. *Huntly USA Corp. v. United States*, 525 F.3d 1370, 1378 (Fed.Cir. 2008). A categorical taking occurs where government action denies the owner "all economically beneficial or productive use of the land." *Lucas v. S.C. Coastal Counsel*, 505 U.S. 1003, 1015 (1992) (citin*g Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980)). This can occur where the government action effects a ban on construction that leaves the owner with property he can do nothing with. *See Lucas*, 505 U.S. at 1019-1020.

Alternatively, when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a non-categorical taking may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978) ("*Penn Central*"). "The inquiry turns in large part…upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle v. Chevron USA Inc.*, 544 U.S. 528, 540 (2005).

A regulatory taking can occur where a municipal body engages in a course of obstruction, animated by hostility towards development, and/or capitulation to public pressure, that frustrates and effectively prevents an owner from making economic use of his property. *See Sherman v. Town of Chester*, 752 F.3d 554 (town's actions in continually delaying and obstructing plaintiff's petition to develop his property over period of years effectively prevented him from making any economic use of his property amounting to a taking); *City of Las Vegas,* 546 P.3d 1239 (city's actions in denying application for development based on pretextual reasons, coupled with its expressed animosity towards the project and acquiescence to public pressure to reject development demonstrated that City would not allow any development of subject land, effected a taking); *Tai Tam v. Missoula County*, 410 Mont. 465 (where proposed subdivision complied with state law, but county frustrated development by insisting that plaintiff meet standards that were never adopted, county effected a taking of plaintiff's land); *C.f., Holman v. City of Warrenton*, 242 F.Supp.2d 791 (city's arbitrary withdrawal of previously issued permit to develop property which was motivated by public sentiment against development effected a taking).

29 Greenwood's Complaint alleges sufficient facts to support both a categorical and non-categorical regulatory taking. The district court did not even consider whether the Complaint set forth a plausible claim for categorical taking.

Had it undertaken that analysis it would have found that the Complaint, indeed, alleges sufficient facts to establish such a taking.

The Complaint recounts how Appellees discussed preventing 29 Greenwood from restoring the Structure, and then engaged in a concerted effort to thwart and frustrate 29 Greenwood from doing so. It can be reasonably inferred from these facts that Appellees intended to permanently block reconstruction of the Structure. 29 Greenwood also alleged that without a habitable structure, the Property has no viable economic or productive use. The district court was required to accept this allegation as true. *C.f., Wilson v. Commonwealth*, 31 Mass.App.Ct. 757 (1992) (on a motion for judgment on the pleadings, plaintiff's assertion that their land has been rendered valueless as a result of state action must be accepted as true). *See also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 720-21 (1999) (where City engaged in dilatory tactics to forestall any development of landowner's property, including denying permit based on spurious reasons, the issue of whether City deprived owner of all economically viable use of his property is predominantly a fact issue for jury to determine). Thus, the Complaint alleges sufficient facts that the Appellees' actions rendered the property devoid of any economic or productive use. This is sufficient to state a categorical taking and the district court erred in dismissing the takings claim.

In addition to the foregoing, the Complaint also adequately pleads a noncategorical taking. It avers sufficient facts to meet each factor of the non-categorical taking analysis set forth in *Penn Central*. It is no great leap to find that Appellees' cumulative actions worked severe economic injury upon 29 Greenwood, establishing the first factor of the *Penn Central* analysis. Although there is no definitive measure of how much economic harm a plaintiff must allege, courts assess the likelihood and extent to which the challenged action "impairs the value or typical use" of a plaintiff's property. *Maine Educ. Ass'n Benefits Tr. v. Cioppa*, 695 F.3d 145, 157 (1st Cir. 2012).

The Complaint plausibly alleges that Appellees, both through word and deed, have signaled that they do not intend to permit 29 Greenwood to develop the Property *at all*. This leaves 29 Greenwood with a piece of land with no viable economic or productive use. Consequently, the Complaint adequately alleges that Appellees have caused 29 Greenwood extreme economic hardship, and the first factor in the *Penn Central* analysis therefore weighs in favor of a taking.[5]

Appellees' conduct has also seriously interfered with 29 Greenwood's distinct, investment-backed expectations. In assessing this factor, a court must

---

[5] The district court found that the Complaint does not allege that "plaintiff has lost its right to use the property consistent with the Landmark Ordinance." Op. p. 14. But that is exactly what the Complaint alleges – e.g. that the Appellees' conduct and purpose, including repudiating the previously issued COA, deprived appellant of his right to use the property consistent with the Landmark Ordinance.

evaluate the reasonableness of the claimant's purported expectations. *Maine Educ. Ass'n Benefits Tr.*, 695 F.3d 145,154 (1ˢᵗ Cir. 2012). The bundle of rights that 29 Greenwood acquired when it purchased the Property included the right to develop the residence consistent with the existing COA. 29 Greenwood intended to resell the Property after restoration was complete, to realize a profit. *See Lucas*, 505 U.S. at 1017 ("[F]or what is the land but the profits thereof?) (quoting 1 E. Coke, Institutes, ch. 1, Sec. 1 (1ˢᵗ Am. Ed. 1812)). 29 Greenwood could not have foreseen Appellees' obstructive and illegal conduct that effectively rescinded the COA and blocked its ability to reconstruct the Structure. This has wiped out its reasonable, investment-backed expectations[6]. *Sherman v. Town of Chester*, 752 F.3d at 565 (plaintiff reasonably expected to be able to recoup his investment on property he purchased to develop, and defendants' dilatoriness and obstruction in refusing to issue permit interfered with his reasonable, investment-backed expectations); *Holcim – NER*, 671 F.Supp. 3d at 94 ("According to plaintiff, defendant abandoned their long-standing permitting practices, acted arbitrarily and

---

[6] Contrary to the Court's opinion, appellant does merely allege a temporary diminution in the property value. J.A. at 122, Memorandum & Order at 14. Rather, by their *de facto* revocation of the COA, their collusion to prevent 29 Greenwood from building a habitable structure, their arbitrary rejection of plans that NHC previously approved as well as all other submissions based on pretextual reasons, Appellees have signaled they will not allow completion of a habitable structure *at all*, thus permanently depriving the property of any economically viable use.

imposed unjustified and bias-driven restrictions. Given such allegations at this stage of the proceedings, the Court acknowledges the reasonableness of plaintiff's investment-backed expectations."). Thus, the second Penn Central factor counsels in favor of a taking.

Finally, the character of the government action, under the facts alleged, weighs in favor of finding a taking. Inquiries in this area examine whether the injury was incident to "some public program adjusting the benefits and burdens of economic life to promote the common good." *Lingle,* 544 U.S. at 540. Appellees' actions, even if they are a response to public outcry, do not further a legitimate public purpose or promote the common good. *Town of Swampscott*, 671 F.Supp.3d at 94 ("the exercise of a town's police power ostensibly taken to promote the common good may constitute a taking if it 'does not substantially advance legitimate state interests.'") (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485 (1987). Far from promoting the common good, Appellees' actions in this case undermined it.

The COA was issued after careful consideration of the plans submitted by 29 Greenwood's predecessor, which were found to be consonant with the preservation of the historic character of the Structure. In abrogating the COA, the Appellees acted arbitrarily and effectively left a landmark historic structure, in mid-reconstruction state, to further waste away from its existing dilapidated state,

exposed to the elements, for years. Far from advancing the common good, Appellees' action both repudiated the careful procedures contemplated by the Landmark Ordinance, and undermined the very values the Ordinance exists to protect. *See* Newton Ordinances, Revised, Ch. 22, § 22-60. The character of the government action, as alleged, is irrational, motivated by personal feelings and public pressure, and does not promote the common good. Consequently, this factor weighs in 29 Greenwood's favor as well.

In sum, the facts as alleged raise a plausible claim for a non-category taking as well as a categorical taking, and the district court erred in finding otherwise.

## C. COMPLAINT PLAUSIBLY ALLEGED A VIOLATION OF MASSACHUSETTS' CIVIL RIGHTS ACT, MASS. G. L. c. 12, §11I

The district court dismissed 29 Greenwood's claim under the Massachusetts Civil Rights Act, Mass. G.L. c. 12, Sec. 11I ("The Act"), against the individual defendants[7] because it found: 1) that the complaint does not make out a claim for a regulatory taking; and 2) because the individual defendants are entitled to qualified immunity. *See* J.A. at 130, Memorandum & Order p. 22. But once again, a close reading of the Complaint demonstrates that it does sufficiently plead that Appellees

---

[7] The Court also held that the Complaint against these defendants is subject to dismissal for insufficient service of process. It did not indicate that it was dismissing the Complaint on these grounds. Were the court to have dismissed under Rule 12(b)(5), it would be constrained to have done so without prejudice. *See* F.R.C.P. 4(m).

violated 29 Greenwood's state and federal constitutional rights; and that Appellees are not immunized from liability for this claim.

As an anterior matter, the court erred when it cabined its analysis to whether 29 Greenwood had plausibly alleged interference with rights under the Takings Clause. 29 Greenwood's claim under the Act sweeps more broadly than that. Specifically, 29 Greenwood contends that Individual Appellees "have interfered with Plaintiff's *exercise of its property rights* secured by the U. S. Constitution *and Massachusetts Declaration of Rights*." (Emphasis added) Jt. Appx. at 52, ¶ 228. Appellees' conduct did not only exact a taking, but violated Articles 1, 10, and 12 of the Massachusetts Declaration of Rights, which protect an individual's right to use and enjoy his property. The Complaint sets forth viable claims for invasions of these rights in addition to 29 Greenwood's rights under the Takings Clause, and the district court erred in not considering these rights.

In order to state a claim for violation of the Act, 29 Greenwood must establish: 1) its exercise and enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, 2) have been interfered with, or attempted to be interfered with, and 3) that the interference or attempted interference was by threats, intimidation or coercion. *Freeman v. Planning Bd. of West Boynton*, 419 Mass. 548, 646 N.E.2d 139 (1995). The Act is remedial in

nature, and therefore should be liberally construed.  *Buster v. George W. Moore, Inc.,* 438 Mass. 635, 645, 783 N.E.2d 399 (2003).

The Complaint sets forth facts that plausibly meet each of the foregoing elements of 29 Greenwood's claim.  As to the first element, as already described, *supra* at Sec. IV(B), the Complaint sets forth facts that plausibly allege the exercise of rights guaranteed under U.S. Const. amend. V and Massachusetts statute, Mass Gen, L. ch. 79, § 10.   In addition to this, the Complaint plausibly alleges that 29 Greenwood exercised rights secured to it under Articles 1, 10, and 12 of the Massachusetts Declaration of Rights.  Those Articles confer on 29 Greenwood the right to use its property consistent with the strictures of the existing COA.  *See Kennie v. Natural Resources Dep't. of Dennis*, 451 Mass. 754, 760 (2008) (citing *Haufler v. Zotos*, 446 Mass. 489, 504 (2006). *See also*, *Bell v. Mazza*, 394 Mass. 176, 178 (1985).  The right to use property encompasses the "right to own land and to use and improve it according to the owner's conceptions of pleasure." *Id., quoting Brett v. Building Comm'r of Brookline*, 250 Mass. 73, 77 (1924). Massachusetts courts have "recognized that an owner of real property has a constitutional right to use and improve that property, subject, of course, to limitations on development lawfully imposed by state law or by municipal regulation." *Swanset Dev. Corp*., 423 Mass. at 396.  Thus, in addition to rights vouched safe under the Takings Clause, the Complaint plausibly alleges that 29

Greenwood was exercising or attempting to exercise rights protected under the Massachusetts Declaration of Rights.

Further, the Complaint adequately alleges that Individual Appellees interfered with those rights when they forced 29 Greenwood to cease reconstruction under the duly issued COA -- effectively rescinding it – conspired to prevent it from completing the restoration at all, invented baseless excuses to refuse to lift the stop work order, levied fines, and vowed (mayor) to pursue legal action against 29 Greenwood.  As a result of this conduct, Appellees have prevented 29 Greenwood from using its Property for any purpose and thus interfered with rights secured to it under the Takings Clause and the Massachusetts Declaration of Rights.  *Thyng v. City of Quincy*, 32 Mass.L.Rptr. 215 (Super.Ct. 2014) (where Conservation Commission Administrator expressed animus towards plaintiff's project, members of the Conservation Commission delayed hearings on the application and made findings and conditions denying the project that were not discussed at hearing, ignored court order to schedule a hearing, and mayor made phone calls pressuring various city officials to reject the project the defendants interfered with right to use and enjoy property and a trial was necessary to determine the involvement of the various individual defendants in interfering with plaintiff's protected rights.); *Kennie*, 451 Mass. 754, 760 (where shellfish constable expressed intent to prevent plaintiff from building a dock on his property

and engaged in actions that effectuated that intent constable interfered plaintiff's rights under articles 1, 10, and 12 of the Massachusetts Declaration of Rights).

Finally, the Individual Appellees have interfered or attempted to interfere with 29 Greenwood's exercise of its property rights through a course of threats, intimidation and coercion. A threat is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc. v. Blake,* 417 Mass. 467, 474 (1994). Intimidation "involves putting in fear for the purpose of compelling or deterring conduct." *Id.* And coercion is "the application to another of such force, either physical or moral, as to constrain him to do against his will something would not otherwise have done." *Id.* (*quoting Deas v. Dempsey*, 403 Mass. 468, 471 (1988)).

"Economic coercion alone may constitute 'threats, intimidation or coercion' in violation of the act." *Buster v, George W. Moore, Inc.*, 438 Mass. 635 (2003). Further, adverse action that is part of a scheme of harassment can also constitute threats, intimidation or coercion under the Act. *Murphy v. Duxbury*, 40 Mass.App.Ct. 513, 518, 665 N.E.2d 1014 (1996). In order to establish a scheme of harassment there must be "some evidence of animus against the plaintiff[] or their project and an attempt to thwart the project through adverse administrative action unrelated to a board's legitimate concerns." *Id.*

In addition, statements by a public official expressing animus towards a particular developmental project, followed by actions taken to prevent the project constitute coercion. *See Thyng v. City of Quinc*y, 32 Mass.L.Rptr. 215 (2014) (citing Kenny, 451 Mass at 763-764) ("when coercive statements are made by someone with official status and coupled with 'actions in furtherance of [the] statements'" it is for the factfinder to determine whether the plaintiff was coerced)

The Complaint sufficiently alleges that Appellees engaged course of harassment against 29 Greenwood that was fueled by animus against its project and attempts to thwart the project through adverse administrative action unrelated to legitimate concerns. Appellees Hax Holmes, Dimond, and Cornelius each expressed animus toward the project and the idea that 29 Greenwood would realize a profit from it and discussed ways to prevent the completion of the restoration in perpetuity, while fines accrued. Hax Holmes posted negative news articles and angry letters and emails about the project on the City's public website that humiliated and stigmatized plaintiff. Hax Holmes filed a complaint against 29 Greenwood on false pretenses and Lojak issued a stop work order. NHC thereafter voted to impose fines of $300/day for a nonexistent offense. Dimond advised the Commission that the only submission they should accept from 29 Greenwood was one that showed it making no profit from the project. Subsequently, the Commission rejected every plan 29 Greenwood submitted based on unadopted

standards and pretexts. In other words, after expressing animus towards the project, Hax Holmes, Cornelius and Dimond pursued actions against 29 Greenwood that had the intended effect of thwarting the project. The mayor, for her part, expressed her own outrage at the project, and threatened 29 Greenwood with legal action in emails to constituents. Then, just after 29 Greenwood filed the underlying Complaint, Lojek filed a *criminal* complaint against 29 Greenwood, based on false allegations, circumventing the civil enforcement process contemplated by the Newton Landmark Ordinance. In his affidavit, Lojek sought $210,000 in fines against 29 Greenwood based on his false allegations.

The above-action constitutes a scheme of harassment: the individually named appellees harbored animosity towards 29 Greenwood's project, and sought to thwart it through administrative actions that did not serve legitimate ends. This constitutes coercion. In addition, Hax Holmes, Cornelius, Dimond and Fuller made coercive statements, followed by actions in furtherance of those statements. That also constitutes coercion. Thus, 29 Greenwood plausibly alleges Appellees interfered with its exercise of protected rights through a series of words and actions meant to coerce 29 Greenwood into abandoning its project and forfeiting its rights. *Bell v. Mazza*, 394 Mass 176 (where defendant vowed to do anything to prevent plaintiffs from constructing a tennis court, formed an association with neighbors dedicated to preventing the construction, threatened to sue plaintiff's blasting

contractor, plaintiff sufficiently alleged threats, intimidation and coercion);

*Pheasant Ridge Assoc. Ltd. Partnership v. Town of Burlington*, 399 Mass. 771, 781

(1987) (dispute of material fact precluding summary judgment existed on issue of

coercion where two members of the Board of Selectmen made statements to the

effect that they would take any action necessary to stop development of property);

*Kennie*, 451 Mass. at 764-765 (holding that constable's statement that he would do

whatever it took to prevent plaintiffs from building a dock had coercive power

given his official status).

### There Is No Qualified Immunity for Appellees

The district court also found that even if the Complaint plausibly alleged a

violation of the Act, all individually named appellees were nonetheless entitled to

qualified immunity because "it 'cannot be said that…city officials would have

understood that their actions' in denying a building permit would deprive plaintiffs

of their property rights." J.A. at 130, Memorandum & Order at p. 22.  Again, the

district court fundamentally misapprehends the Complaint.  29 Greenwood's claim

is not that appellees denied it a building permit, rather it is that Appellees frustrated

29 Greenwood's right to develop the property *consistent with a permit that was*

*already issued* and refused to allow it to complete its project *at all*, leaving it with

a partially deconstructed building that would never be buildable and was, hence,

valueless.

Whether Appellees are entitled to qualified immunity, *vel non*, turns on whether they violated a right that was clearly established at the time they undertook the offending conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To that end, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.*, 483 U.S. 635, 640 (1987) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 535 n. 12.) "The salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Id*.

It is beyond cavil that the right to use and develop one's property has been clearly established for decades in Massachusetts under a legion of precedent. *See Kennie*, 451 Mass. At 765, *Haufler*, 446 Mass. at 507-508; *Pheasant Ridge*, 399 Mass. at 781; *Bell*, 394 Mass. at 178, *Ayasli v. Armstrong*, 56 Mass.App.Ct. 740, 752 (2002); *Tortora v. Inspector of Buildings of Tewksberry*, 41 Mass.App.Ct. 120, 122 (1996). Where officials interfere with the exercise of these constitutional rights through acts of intimidation or coercion, they violate these clearly established rights and are not immune from personal liability under the Act. *See*

*Walsh v. Town of Lakeville*, 431 F.Supp.2d 134, 152 (D.Mass.2006) (where officials attempted to restrict plaintiff's use of her property through threats and intimidation they violated her clearly established rights and were not entitled to qualified immunity.)

Based on the foregoing, Individual Appellees in this case had fair warning that their attempts to interfere with 29 Greenwood's right to develop its property pursuant to the COA --- by a *de facto* rescission of the COA, humiliating 29 Greenwood on their public website, refusing to approve plans NHC had previous greenlit, scheming to prevent it from building a habitable structure and realizing a profit, rejecting its multiple submissions for spurious and pretextual reasons, imposing and attempting to collect fines based on a conceit – violated clear rights enshrined in the Massachusetts Declaration of Rights, and therefore are not entitled to qualified immunity.

In addition to the foregoing, 29 Greenwood's rights pursuant to the 5th Amendment Takings Clause and Massachusetts' Taking Statute were also clearly established when they effected a taking of its property. The United States Supreme Court has long held that if government action "goes too far" in regulating land use, it will be recognized as a regulatory taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *Blair v. Department of Conservation & Recreation*, 457 Mass. 634, 643 (2010) ("[W]hen a regulation substantially restricts the owner's use

of property, so that the regulation 'goes too far,' it may be deemed a regulatory taking of that property for a public use.") Further, it has long recognized that official actions that deny an owner of property any economically viable or productive use of his land effects a taking, *Lucas,* 505 U.S. at 1115; and that government action that works severe economic injury upon a landowner, invades his reasonable investment-backed expectations, and does not promote the common good effects a taking[8]. *Penn Central*, 438 U.S. at 124.

It can scarcely be argued that when officials engage in arbitrary and spiteful actions that effectively strip a landowner of his duly issued permit to develop his property, refuse to reinstate it, hatch a plan to prevent the owner from developing the land to saleable condition, reject all efforts by the landowner to restart his project based on spurious and pretextual reasons, they have engaged in conduct clearly proscribed by the 5th Amendment Takings clause and its Massachusetts analogue. Under existing precedent, Individual Appellees would have been aware of this. 29 Greenwood's allegations and reasonable inferences drawn therefrom vitiate qualified immunity.

---

[8] Notably, the First Circuit has also expressly sanctioned personal capacity Takings claims. *See Asociacion de Subscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 26 (1st Cir. 2007). *See also PDCM Associates, SE v. Quinones*, 2016 ) 2016 W.L. 8711711, at *4 (D.P.R. 2006) (accepting "a Section 1983 Takings violation claim against the individually named Defendants").

Hence, 29 Greenwood has adequately pled that the Individual Appellees violated the Act, and that they are not entitled to immunity for their conduct. The district court erred in dismissing this claim.

### D. EXCESSIVE FINES CLAIM IS RIPE FOR ADJUDICATION

The district court dismissed as unripe 29 Greenwood's claim that the municipal appellee violated the Excessive Fines Clause of the 8th Amendment to the United States Constitution in imposing $270,000.00 in fines on it for a putative violation of the Landmark ordinance. However, the claim is ripe for adjudication.

The Complaint alleged that the City "imposed daily fees against [29 Greenwood] that approximate or exceed Two Hundred Seventy Thousand Dollars ($270,000.00) to date." These fees began to accrue on April 30, 2021. J.A. at 26, ¶ 84. Further the municipal appellee is now seeking to collect those fines through an enforcement process. *Id.* at 44-5, ¶¶187, 188. Nowhere in the complaint does 29 Greenwood aver that the amount of fines to which it is subject is discretionary or speculative. On the contrary, the Complaint adverts to a sum certain that the municipal appellee is presently attempting to collect.

Where the government has commenced an enforcement proceeding to collect a sum certain in fines against an individual, the claim is ripe for review under the Excessive Fines clause of the 8th Amendment. *See Sierra Club v. Khanjhee Holding (US) Inc.,* 655 F.3d 699, 705 (7th 2011) (excessive fines claim

ripened as soon as plaintiff made a motion for imposition of civil penalties on defendant for violating permit, not after the motion was granted); *Stevens v. City of Columbus*, 2021 WL 3562918, at *12 (S.D.Ohio 2021) ("If the City *chooses to seek* fines for failure to remove the alterations to the landscaping…[plaintiff] would have a ripe challenge [under the 8th Amendment]") (emphasis added). *See also Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995) (challenges under the Excessive Fines Clause are generally not ripe "until the *impending* imposition of the challenged fine") (emphasis added).

The district court relied on *Cheffer* to find that 29 Greenwood's Excessive Fines claim was unripe. But *Cheffer* stands on materially different footing than the case at bar. That case involved a preemptive, facial challenge to a statute, the Access Act, including its penalty provision. No fines had been levied against the plaintiff at all, much less a sum certain. The court concluded it could not determine the constitutionality of the penalty provision of the statute because it could not forecast what amount of fines plaintiff would be subject to should she violate the statute. Specifically, it opined, "[b]ecause the Access Act sets only maximum penalties, leaving the courts with broad discretion to determine length of imprisonment or the amount of fines or civil penalties to be assessed in each case…we cannot determine from the face of the Act what penalties will actually be imposed." *Cheffer,* 55 F.3d at 1523. The court concluded, therefore, that it lacked

critical facts on which to evaluate the constitutionality of the penalty provisions, and that "such inquiry is better postponed until the issues are presented in the more concrete circumstances of a challenge to the Act as applied." *Id.*

In this case, 29 Greenwood alleges precisely the amount of the fine municipal appellee is seeking to impose, and there is no indication that the criminal court has discretion to reduce that amount. Hence, district court had precisely the critical facts required to assess the constitutionality of the fine that were lacking in *Cheffer*. The matter was ripe was determination under the reasoning in *Cheffer*.

## V. CONCLUSION

For all of the foregoing reasons, the District Court's grant of dismissal must be reversed.

Respectfully submitted,

/s/ Thomas H. Curran
THOMAS H. CURRAN
BRIAN J. LEFORT
THOMAS H. CURRAN ASSOCIATES, LLC
*Counsel for Plaintiff-Appellant*
75 State Street, Suite 100
Boston, Massachusetts 02109
(617) 207-8670

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,423 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

Dated: September 24, 2024

*/s/* Thomas H. Curran
Thomas H. Curran

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this same date, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which electronically served a copy on all counsel of record.

Dated: September 24, 2024

<u>/s/ Thomas H. Curran</u>
Thomas H. Curran

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

                                                                     **Page**

Memorandum and Order on Defendants' Motion to Dismiss, filed April 30, 2024 ................................................ ADD1

Order of Dismissal, filed April 30, 2024 ..................................................... ADD28

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| **29 GREENWOOD, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **23-10800-FDS** |
| ) | |
| **MAYOR RUTHANNE FULLER, DOUG** ) | |
| **CORNELIUS, PETER DIMOND, KATY** ) | |
| **HAX HOLMES, JOHN LOJEK, ANTHONY** ) | |
| **CICCARIELLO, NEWTON HISTORICAL** ) | |
| **COMMISSION, and CITY OF NEWTON,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

_____

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

**SAYLOR, C.J.**

This case concerns an alleged government taking of a property in Newton,

Massachusetts. The property, located at 29 Greenwood Street, included a historic house that had

been built in 1744 and designated a Newton Local Landmark in 2005.

In January 2021, plaintiff 29 Greenwood, LLC obtained title to the property in order to

renovate it. The property was subject to various restrictions, imposed as part of a certificate of

appropriateness issued to the prior owner, that were intended to preserve its historic character.

Rather than preserve and restore the property, in April 2021 plaintiff demolished the

house. The present dispute concerns the plans proposed by plaintiff to remedy its violation of

the historic restrictions, which thus far the City has not accepted. According to plaintiff, by

failing to approve its plans, the City unlawfully deprived it of the use of its property in violation

ADD1

of the Fifth Amendment and other federal and state law.

Plaintiff has filed suit against the City of Newton, the Newton Historical Commission, Ruthanne Fuller (Mayor of the City of Newton), Doug Cornelius (Chair of the Newton Historical Commission), Peter Diamond (former Chair of the Newton Historical Commission), Katy Hax Holmes (former Chief of Planning for the City of Newton), John Lojek (Commissioner of the Inspectional Services Department), and Anthony Ciccariello (Deputy Commissioner/Plans Examiner of the Inspectional Services Department).  The complaint asserts four counts:  (1) violation of the Takings Clause of the Fifth Amendment against the municipal defendants; (2) violation of Article 10 of the Massachusetts Civil Rights Act against the individual defendants in their individual capacities; (3) tortious interference with prospective advantage against the individual defendants in their individual capacities; and (4) violation of the Excessive Fines Clause of the Eighth Amendment against the municipal defendants.

Defendants have moved to dismiss the complaint in its entirety for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).  For the reasons set forth below, the motion will be granted.

## I.    Background

### A.    Factual Background

The facts are set forth as alleged in the First Amended Complaint ("FAC") unless indicated otherwise.

The structure formerly located at 29 Greenwood Street in Newton, also known as the Gershom Hyde House, was built in approximately 1744.  (FAC ¶ 29).  Although it underwent "a considerable number of renovations" in the centuries following its construction, the house was listed on the National Register of Historic Places in 1986 and designated a Newton Local Landmark in 2005.  (*Id.* at ¶ 30).

2

ADD2

According to the complaint, by 2011, the property was "uninhabited and in substantial decay." (*Id.* at ¶ 33).  According to one 2013 report, the property was "suffering from rot, fire damage, moisture, sinking, decay and numerous other structural problems that rendered the house and barn uninhabitable and unsalvageable." (*Id.*).

In 2017, plaintiff's predecessor-in-interest submitted applications to the Newton Historical Commission ("NHC") and Inspectional Services Department ("ISD") to undertake construction on the property.  (*Id.* at ¶ 38).  On July 27, 2017, "the NHC unanimously approved the issuance of a certificate of appropriateness, based on the then-owner's architectural plans submitted to and approved by the Commission." (*Id.*).  The certificate of appropriateness "approved a demolition of the rear portion of the house and a significant addition onto the rear of the Property." (*Id.* at ¶ 39).  It "further called for a complete renovation and reconstruction of the original residence." (*Id.*).  That certificate of appropriateness was later extended on February 28, 2019, and again on February 27, 2020.  (*Id.* at ¶ 41).

In January 2021, plaintiff 29 Greenwood, LLC acquired the property for $1,150,000.  (*Id.* at ¶¶ 44-45).  At that time, plaintiff "ensured that all its permits were valid and, at the direction of the ISD, transferred the demolition and construction permits to its own contractors." (*Id.* at ¶ 46).

In February 2021, plaintiff began construction activities on the property.  (*Id.* at ¶ 47).  ISD remained involved, "monitoring the progress with the Project, including meeting with Plaintiff's on-site general contractor and site personnel." (*Id.*).

On February 11, 2021, ISD issued a stop-work order after plaintiff removed a gable end of the house.  (*Id.* at ¶ 48).  On February 13, 2021, plaintiff provided ISD and Katy Hax Holmes, the Chief of Planning, with a letter from a structural engineer who had been retained by plaintiff

ADD3

"to assess the structural integrity of the house and render a professional opinion." (*Id.* at ¶¶ 49-50).  Plaintiff's engineer concluded that the structure was "highly compromised due to long term neglect and moisture infiltration that in t[urn] has attracted termite infiltration." (*Id.* at ¶ 50).  As a result, the letter stated, "renovations of the existing building [would be] virtually impossible without replacing every single structural member of the building in order to meet certain building code and structural criteria." (*Id.*).  Plaintiff later provided the city with a supplemental report "detailing the extensive structural damage and rot on the Property." (*Id.* at ¶ 56).

After numerous e-mail communications and onsite meetings involving plaintiff, ISD, the NHC, and various city officials, plaintiff "put the gable back in . . . . in one piece," and the first stop-work order was lifted.  (*Id.* at ¶¶ 51-58).  Plaintiff then resumed work on the property. According to the complaint, plaintiff took "painstaking, costly and time-consuming efforts to preserve the portions of the main house that could be salvaged for integration into reconstruction." (*Id.* at ¶ 60).  ISD inspector Paul Gilbert allegedly visited the site daily to monitor the work.  (*Id.* at ¶ 61).

At some point in April 2021, plaintiff demolished the historic portion of the house. Plaintiff does not dispute that it did so.

The complaint alleges that despite a history of cooperation between plaintiff and Newton officials, at that point defendants "decided to take a far different and far more confrontational position against Plaintiff." (*Id.* at ¶ 63).  More specifically, they allegedly decided that "under no circumstances would this Project be allowed to go forward, and under no circumstance would the Plaintiff be allowed by the City to develop the Project and sell it, for a profit or otherwise." (*Id.* at ¶ 65).[1]

---

[1] The complaint alleges that on March 15, 2021, "Hax Holmes emailed Plaintiff inquiring as to whether the Property was being listed for re-sale." (*Id.* at ¶ 64).  At the same time, she "telephoned Plaintiff's real estate broker

4

According to the complaint, on April 29, 2021, e-mail correspondence among city officials accused plaintiff of "unilaterally taking the house down, claiming it was 'torn down' despite the 'best efforts' of inspector Gilbert and Hax Holmes." (*Id.* at ¶ 66). A second stop-work order was issued by ISD on April 30, 2021. (*Id.* at ¶ 68).

According to the complaint, in May 2021, "online news articles were being posted to the City's website expressing the public's misinformed outrage and calling for the maximum penalties and fines against Plaintiff." (*Id.* at ¶ 75). It alleges that "an internal 'blame game' erupted amongst ISD, the NHC and other City departments, triggered by complaints from citizens, many of which were surreptitiously stirred up by Hax Holmes and other Defendants and City officials." (*Id.* at ¶ 77). Although the ISD had allegedly begun to "acknowledge that the plans approved for the Project were at least ambiguous enough to permit the work undertaken by the Plaintiff," Hax Holmes was "compartmentalizing information within the City's departments in order to paint Plaintiff in the worst possible light and drive the NHC towards imposing draconian penalties against Plaintiff, with the added benefit of deflecting 'blame' from the NHC and onto the Plaintiff." (*Id.* at ¶¶ 81-82).

On May 27, 2021, the NHC conducted a public meeting. According to the complaint, it "incorrectly and unlawfully determined" that plaintiff's demolition of the historic house violated the Landmark Ordinance. (*Id.* at ¶ 83). Plaintiff did not, however, appeal that determination. The commission also voted to impose a fine against plaintiff of $300 per day. (*Id.* at ¶ 84).[2]

---

under a pretext, pretending to be an interested buyer." (*Id.*). During the phone call, Hax Holmes "blew up at the broker and started yelling, only then revealing her true identity." (*Id.*). The complaint concludes that "by this time, Hax Holmes, in conjunction with the other Defendants were working, through a deliberate stratagem, to affirmatively impede Plaintiff's efforts with respect to the Property." (*Id.*).

[2] According to the complaint, as of October 17, 2023, plaintiff had accrued approximately $270,000 in fines. (*Id.* ¶ 84).

ADD5

On May 29, 2021, city officials allegedly acknowledged in internal e-mails that "[r]ight now the developer is stuck with a property that he can't do anything with and its costing him $300 per day." (*Id.* at ¶ 86). They also allegedly acknowledged that they "intend[ed] to make it hard" for plaintiff to profit from the project, and noted: "We don't have to do anything at this point. Time is on our side." (*Id.* at ¶ 88).

On July 7, 2021, "citizens of Newton began signing a petition calling for the Commission to deny any and all plans submitted regarding the Property." (*Id.* at ¶ 92).

As noted, after the NHC issued a determination that plaintiff had violated the Landmark Ordinance, plaintiff did not appeal. Instead, it submitted a proposal to reconstruct the building to remediate the violation. (*Id.* at ¶ 93).

On August 11, 2021, plaintiff "submitted an extensive proposal to repair and restore the Property's damaged 18th century post and beam structure and to construct a historically accurate exterior over the restored structure." (*Id.* at ¶ 93-96).

On August 26, 2021, the NHC held a public hearing to review plaintiff's proposal. (*Id.* at ¶ 101). At the hearing, plaintiff's architect "presented the Board with extensive information in support [of] Plaintiff's proposal to remediate the alleged violation of the COA and resume work on the Project." (*Id.*). The architect stated that "the aim of Plaintiff's proposal was to construct a historically accurate exterior to the Property and incorporate and repair existing elements of the property which had not been discarded as part of the planned and approved rehabilitation of the Property." (*Id.* at ¶ 102). Furthermore, the architect affirmed that "any original elements of the Property that could not be reused would be measured and replicated." (*Id.* at ¶ 103).

After the August 26 hearing, plaintiff was "asked to provide another complete set of design plans for its proposed repair and rehabilitation of the Property, including for the

ADD6

previously approved rear addition." (*Id.* at ¶ 106).  On October 6, 2021, plaintiff "submitted a full set of architectural drawings illustrating the rehabilitation work to be completed at the Property" and submitted complete building exterior drawings, a materials specification booklet, color renderings of the project exterior and a narrative summary of Plaintiff's plans." (*Id.* at ¶ 107).  On October 21, 2021, in response to further inquiry by the NHC, plaintiff "provided additional information concerning the elevation and height of various aspects of the project." (*Id.* at ¶ 109).

According to the complaint, even though plaintiff "by this time was endeavoring in good faith to resolve the controversy positively and proactively in good faith," defendants had "already decided that they would not accept any resolution by Plaintiff but would instead punish Plaintiff." (*Id.* at ¶ 113).  The complaint further alleges that Mayor Fuller had become involved in the scheme and had "taken a stance of punishing Plaintiff." (*Id.* at ¶ 110).  Plaintiff was "denied any chance to remediate and improve the Property," and the project was "absolutely and indefinitely paralyzed." (*Id.* at ¶ 115).  There was "no possible way" for plaintiff to "comply with any type of City standard." (*Id.*).

On October 28, 2021, the NHC held another public meeting concerning the property.  At the meeting, the commission allegedly "revoked its prior approval of the rear addition to the Property claiming that Plaintiff's partial demolition of the property, which complied with its building permit, somehow nullified the Board's prior approval of the rear extension." (*Id.* at ¶ 121).

According to the complaint, by January 2022, plaintiff had become increasingly "astonished at the City's 'move the goalposts' strategy of delaying any action to resolve the NHC's issues with the Project, a plan which the NHC knew was costing Plaintiff $300 per day in

7

ADD7

fines and causing a complete shutdown of the Project." (*Id.* at ¶ 124).  On January 14, 2022, in an e-mail to the Chief Preservation Planner, plaintiff's architect wrote:  "I am genuinely concerned that due to the high level of emotion surrounding the Gershom Hyde house there may have been a failure to communicate or a misunderstanding that is blocking the path for us to move the reconstruction process forward." (*Id.* at ¶ 125).

On April 20, 2022, the NHC contacted plaintiff and requested that "it justify its research process with respect to its submitted rehabilitation plans for the Property, as-built documentation and proposed construction." (*Id.* at ¶ 127).  Although the complaint alleges that that information had already been submitted to the commission, plaintiff provided all of the requested information on April 22, 2022.  (*Id.* at ¶ 129).

On April 28, 2022, the NHC held a meeting "during which the Plaintiff, in an effort to assuage the concerns of the Commission, submitted revised plans to address the alleged violations of the certificate of appropriateness, thereby eliminating the proposed, and previously approved, rear addition, restoring the original footprint of the Property and reincorporating preservation ideals and the historic fabric of the Property that was not even present at the Property prior to the approved partial demolition." (*Id.* at ¶ 130).  According to the complaint, plaintiff did so even though those proposed plans would be "extraordinarily expensive and would eliminate any potential profit that may have been obtained by the Plaintiff under the plans for the Property that the Commission had already approved at the time Plaintiff took title thereto in January 2021." (*Id.* at ¶ 131).  At the conclusion of the April 28 meeting, the NHC requested additional information.[3]

---

[3] According to the complaint, it was not clear to the NHC itself what information plaintiff still needed to provide.  (*Id.* at ¶ 134).  City officials were allegedly "unsure of how to proceed."  (*Id.*).  One official allegedly suggested that plaintiff "[s]how a detailed budget sheet that shows no profit."  (*Id.* at ¶ 135).

8

ADD8

On May 27, 2022, plaintiff "submitted yet another set of updated plans and specifications to the Commission for a new building on the Property."  On June 23, 2022, it submitted "a list of the resources used and the archives which were reviewed to develop its plans and determine the period of significance for the structure."  (*Id.* at ¶ 138).

On August 2, 2022, the NHC, after a public hearing, "rejected the Plaintiff's revised plans, claiming that its submissions did not meet the Secretary of the Interior's Standards for the Reconstruction of Historic Properties," which (according to the complaint) "the City had never adopted."  (*Id.* at ¶ 139).  Finally, "[o]n August 12, 2022—more than fifteen months after issuing the total Stop Work Order on April 30, 2021, and after numerous submissions and re-submissions—the NHC again rejected Plaintiff's remediation plan."  (*Id.* at ¶ 140).

Upon issuing that rejection, the City allegedly "barred Plaintiff from accessing the Property and from removing anything therefrom—including the historic materials Plaintiff intended to preserve for reintegration in the reconstructed house."  (*Id.* at ¶ 185).  The City also allegedly barred plaintiff "from performing work of any kind, including repairs, winterizing and other routine maintenance, on the Property site."  (*Id.* at ¶ 186).

At the same time, after plaintiff on March 31, 2023, filed its initial complaint in this action, "the City of Newton filed a criminal complaint against Plaintiff in connection with the $300 daily fine imposed by the Commission.  Defendant John Lojek signed an affidavit in support of the complaint, stating that Plaintiff demolished a building on landmark property without a proper certificate of appropriateness, and thus, Plaintiff owed, at that moment, $210,000 for an alleged violation [of] Newton's Landmark Ordinance."  (*Id.* at ¶ 187).  The complaint alleges that the "criminal complaint is just the latest in a long line of coercive, retaliatory, and intimidating tactics by the City."  (*Id.* at ¶ 197).

On October 13, 2023, the City informed plaintiff of "conditions on the Property that violate the Newton Revised Ordinances, Chapter 5, Article II, Section 5-22(b), which concerns accumulation of 'junk' or debris and overgrowth of vegetation." (*Id.* at ¶ 199). According to the complaint, however, at the same time "Plaintiff's prior efforts to enter the Property to remove construction debris or otherwise perform such maintenance have been met with remonstrance, and the Plaintiff was specifically instructed to seal off the Property by the Defendants." (*Id.* at ¶ 200).

The complaint alleges that plaintiff will "now face additional fines for failing to remedy conditions on a Property on which Defendants have categorically prevented Plaintiff from entering onto and working on for the past two-and-a-half years." (*Id.* at ¶ 201). And it alleges that it is unable to "remedy the present conditions on the Property nor to complete the Project as contemplated despite the fact that Plaintiff at all times acted within the scope of the approved plans and the COA." (*Id.* at ¶ 212).

**B.     Procedural Background**

The original complaint was filed on February 16, 2023, in Middlesex Superior Court. On April 13, 2023, defendants removed the action to this Court. Defendants moved to dismiss the complaint for failure to state a claim on April 24, 2023; in response, plaintiff moved for leave to file an amended complaint. The Court granted plaintiff's motion on October 3, 2023, and the amended complaint was filed on October 17, 2023.

As noted, the amended complaint asserts claims against the City of Newton, the Newton Historical Commission, Ruthanne Fuller, Doug Cornelius, Peter Diamond, Katy Hax Holmes, John Lojek, and Anthony Ciccariello. The amended complaint asserts four counts: (1) violation of the Takings Clause of the Fifth Amendment and violation of Mass. Gen. Laws ch. 79, § 10 against the municipal defendants; (2) violation of Article 10 of the Massachusetts Civil Rights

10

Act against the individual defendants in their individual capacities; (3) tortious interference with prospective advantage against the individual defendants in their individual capacities; and (4) violation of the Excessive Fines Clause of the Eighth Amendment against the municipal defendants.

Defendants have moved to dismiss the amended complaint in its entirety under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.   <u>Standard of Review</u>

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

ADD11

III.    **Analysis**

    A.    **Claim for Violation of the Fifth Amendment and Mass. Gen. Laws ch. 79, § 10 (Count 1)**

Count 1 alleges that the City of Newton and the NHC violated the Fifth Amendment to the United States Constitution as well as Mass. Gen. Laws ch. 79, § 10.  It alleges that defendants "hatched a plan to revoke Plaintiff's authority to continue to work on the Project and make it economically and physically impossible to finish the Project, thereby taking the Property for the City."  (FAC ¶ 220).  It alleges that "[d]efendants did not merely produce some fluctuation of the property's value, but in fact deprived Plaintiff of any sort of economic value that could be obtained from the Property."  (*Id.*).  As a result, it alleges that defendants "made a *regulatory taking*" of the property.  (*Id.* at ¶ 220) (emphasis added).

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V.  Similarly, Mass. Gen. Laws ch. 79, § 10 provides that "[w]hen the real estate of any person has been taken for the public use or has been damaged by the construction, maintenance, operation, alteration, repair or discontinuance of a public improvement or has been entered for a public purpose, but such taking, entry or damage was not effected by or in accordance with a formal vote or order of the board of officers of a body politic or corporate duly authorized by law . . . and by such taking, damage, entry, seizure, destruction or use he has suffered an injury for which he is entitled to compensation, the damages therefor may be recovered under this chapter."  Mass. Gen. Laws ch. 79, § 10.

The Supreme Court has held that there are "two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005).  First, the government must provide just compensation if it "requires an owner to suffer a permanent physical invasion of her property—however minor."

ADD12

*Id.* Second, the government must provide just compensation where it "completely deprive an owner of 'all economically beneficial us[e]' of her property . . . . except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property." *Id.* (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019, 1030 (1992)).

Outside of those two "*per se*" categories, "regulatory takings challenges are governed by the standards set forth in *Penn Central*." *Id.* In *Penn Central*, the Supreme Court " identified several factors that have particular significance" for evaluating a regulatory-taking claim. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Those factors include the "economic impact of the regulation on the claimant," "the extent to which the regulation has interfered with distinct investment-backed expectations," and "the character of the governmental action." *Id.*

Here, plaintiff's regulatory-takings claims are subject to dismissal under the *Penn Central* framework.[4] To begin, plaintiff's arguments largely ignore the basic (and undisputed) fact that it purchased the property knowing that it was subject to the Landmark Ordinance, and that the certificate of appropriateness issued to its predecessor contained various restrictions and requirements intended to preserve the historic structure. It is a reasonable inference that the price paid by plaintiff for the property reflected those restrictions. And plaintiff does not dispute that

---

[4] Defendants contend that "Plaintiff waived its right to argue against the application of the stop work order, and the determination by the NHC that it violated the certificate of appropriateness, when it failed to appeal these determinations in the time period set forth by state statute and local ordinance." (ECF No. 33, 6). Pursuant to the Ordinances of the City of Newton, "[a]ny person aggrieved by a determination of the commission, or by the finding of a person or persons making an administrative review as provided herein, may, within twenty . . . days after the filing of the notice of the aforesaid determination or finding with the city clerk, appeal to the superior court sitting in equity for Middlesex County." NEWTON, MASS., REV. GEN. ORDINANCES, ch. 22, § 22-71. Again, plaintiff does not dispute that it did not appeal the NHC's decision. Even putting aside the issue of whether that failure to appeal is fatal to its claim under Count 1, the complaint still fails to allege sufficient facts to state a claim for a regulatory taking.

the City determined that it violated the ordinance when it demolished the structure—again, a

determination that plaintiff did not appeal.  This dispute arises out of the remedial measures that

plaintiff has proposed and the City has thus far failed to approve.  Particularly when viewed in

that light, the claim of a regulatory taking is plainly deficient.

As to the first *Penn Central* factor, the "economic impact of the regulation on the

claimant," the complaint alleges in conclusory terms that defendants have "deprived it of *all*

use—economic or otherwise—of the Property in the name of 'preservation.'" (FAC ¶ 3).  It also

alleges that defendants have "opportunistically leveraged the misinformed disapproval of the

public to bar Plaintiff from ever developing the Property or realizing a profit of any kind." (*Id.* at

¶ 207).  According to the complaint, "qualified buyers interested in purchasing" the property

have all "ultimately walked away" due the defendants' "pattern of malice and corruption

impeding completion of the Project and otherwise tainting the Property." (*Id.* at ¶¶ 209-10).

The  complaint does not allege, however, a plausible factual basis for the claim that

plaintiff has lost all of its possessory rights.  It does not allege, for example, that plaintiff no

longer holds title to the property, that it has lost its right to sell the property, or that it has lost its

right to use the property consistent with the Landmark Ordinance.  As the First Circuit has held,

government "infringement that leaves virtually the whole of the owner's possessory rights intact

does not constitute a taking." *McAndrews v. Fleet Bank of Massachusetts, N.A.*, 989 F.2d 13 (1st

Cir. 1993).

At most, the complaint alleges a temporary diminution in property value until the City

approves a new set of construction plans—that is, a remedy for plaintiff's undisputed destruction

of a protected historic structure.  *See Ruiz*, 496 F.3d at 5.  While the complaint alleges that

defendants' actions have been "characterized by constantly changing rules and standards," it

14

ADD14

does not allege that it has been precluded from submitting new development plans that do comply with those requirements and standards. (FAC ¶ 220). And while the complaint contains a great deal of charged rhetoric and conclusory allegations, it does not assert a plausible factual basis to believe the City would never approve plans that in fact comply with historic renovation standards. (ECF No. 33, 8). Courts have held uniformly that such a diminution of property value does not constitute a taking. *See, e.g.*, *Agins v. City of Tiburon*, 447 U.S. at 263, n. 9 (1980) (highlighting that "[m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership" and "cannot be considered as a taking in the constitutional sense") (internal quotation marks omitted); *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 645 (1993) (explaining that "diminution in a property's value, however serious, is insufficient to demonstrate a taking"); *Penn Cent.*, 438 U.S. at 131 (noting that courts "uniformly reject the proposition that diminution in property value, standing alone, can establish a 'taking'").

As to the second *Penn Central* factor, "the extent to which the regulation has interfered with distinct investment-backed expectations," the complaint also falls short. *Penn Cent.*, 438 U.S. at 124. It alleges that "when Plaintiff purchased the Property, it possessed approved plans to develop the Property." (FAC ¶ 217). In addition, "[a]s Plaintiff undertook to partially demolish and reconstruct the Property in accordance with the approved plans and COA, Defendant was fully aware of the structural condition of the property," which was "structurally unsound, uninhabited and susceptible to collapse." (FAC ¶¶ 217-19). Based on that, plaintiff contends that "[p]recisely due to the existence of approved plans and COA, Plaintiff had an investment-backed expectation, since its Project was in full compliance with the City ordinances." (*Id.* at ¶ 219).

15

ADD15

The adoption of the Landmark Ordinance and the subsequent designation of the structure as historic—both of which preceded plaintiff's purchase of the property—clearly did not interfere with plaintiff's reasonable investment-backed expectations.  Plaintiff does not allege that it "invested in land for development, only to see a novel regulation destroy the value of [its] property."  (ECF No. 33, 10).  Instead, it knew when it purchased the property in 2021 that the structure was a designated historical landmark and that all construction required approval by the City.  (FAC ¶¶ 44-47).  And it reasonably should have expected that the City would enforce its restrictions if plaintiff violated them.  Plaintiff therefore had no "reasonable, investment-backed expectation that it would be allowed to demolish the landmarked home on the Property."  (ECF No. 33, 9).  As the court explained in *Grasso v. City of New Bedford*, "[t]he government is not required to compensate an individual for denying him the right to use that which he has never owned."  *Grasso v. City of New Bedford*, 55 Mass. App. Ct. 1116, at *11 (2002) (internal quotation marks omitted).

Finally, the claim fails under the third *Penn Central* factor, "the character of the governmental action."  *Penn Cent.*, 438 U.S. at 124.  The allegations of the complaint concern the city's enforcement of the Landmark Ordinance and its denial of plaintiff's remediation applications.  Such actions are "typically given great leeway by courts."  *Zarba v. Town of Oak Bluffs*, 2020 WL 4597012, at *4 (D. Mass. Aug. 11, 2020), *aff'd*, 2021 WL 4025643 (1st Cir. Aug. 13, 2021); *see also Sutton v. Chanceford Twp.*, 186 F. Supp. 3d 342 (M.D. Pa. 2016) (noting that "if the law at issue applies generally to a broad class of properties, a court is likely to find that no taking has occurred" and that "[s]tate and local laws affecting land use, including zoning laws, are extended broad latitude under current standards") (internal quotation marks omitted).

ADD16

In short, the allegations of the complaint show that plaintiff purchased the property knowing that it was subject to historic restrictions; demolished the property in violation of those restrictions; and to date has failed to propose a remedial plan that met with the City's approval. That is insufficient, under the circumstances, to state a claim for a regulatory taking in violation of the Fifth Amendment. Accordingly, the motion to dismiss will be granted as to Count 1.

### B.   Claims for Violation of Massachusetts Civil Rights Act (Count 2) and Tortious Interference with Prospective Advantage (Count 3)

Count 2 asserts a claim against the individual defendants (Fuller, Cornelius, Dimond, Hax Holmes, Ciccariello, and Lojek) in their individual capacities under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H-11J. Count 3 asserts a claim against the individual defendants in their individual capacities for tortious interference with prospective advantage. Defendants contend that both Counts 2 and 3 should be dismissed against defendants Fuller, Lojek, Ciccariello, Hax Holmes, and Cornelius for insufficient service of process.

#### 1.    Insufficient Service of Process

Before a federal court may exercise personal jurisdiction over a defendant, proper service of process must be effected. *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). When the sufficiency of process is challenged under Rule 12(b)(5), plaintiff bears "the burden of proving proper service." *Rivera-Lopez v. Municipality of Dorado*, 979 F.2d 885, 887 (1st Cir. 1992). Rule 4 sets forth the acceptable methods for service of process. Fed. R. Civ. P. 4.

Under Rule 4(e), there are four ways to serve an individual defendant within a federal judicial district: (1) by following the requirements of state law for serving a summons in actions brought in the courts of general jurisdiction in the state where the district court is located or where service is made; (2) by delivering a copy of the summons and the complaint to the

individual personally; (3) by leaving copies of those items at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or (4) by delivering copies to an agent authorized by appointment or by law to receive service of process.

Under the federal rules, service of process must take place within 90 days after the complaint is filed, or the court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time."  Fed. R. Civ. P. 4(m).  If the plaintiff shows good cause, then "the court must extend the time for service for an appropriate period." *Id.*  The court, in its discretion, may also grant an extension of time even absent good cause. Fed. R. Civ. P. 4 Advisory Committee's Note (1993).

Defendants contend that Fuller, Lojek, Ciccariello, Cornelius, and Hax Holmes have never been served with a copy of the original complaint.[5]  With respect to Fuller, Lojek, Ciccariello, and Cornelius, it does not appear that plaintiff complied with any of the available methods under Rule 4(e).  According to the proofs of service filed with the Court, they were "served with the original Complaint through a summons left with 'Janett Ferguson,' an employee in the Newton City Clerk's office."  (ECF No. 33, 24).

Service was only proper, then, if Ferguson was an agent authorized by appointment or law to receive service of process on behalf of the individual defendants.  There was no evidence that such is the case.  Plaintiff does not identify any conduct on the part of any of the individual defendants that would lead a reasonable person to believe that they had granted Ferguson, or any other employee, apparent or actual authority to receive process for them.

_____

[5] Defendants acknowledge that they were served with the amended complaint in this case.  Nevertheless, that is not sufficient to cure prior deficiencies in service.  *See Cryer v. UMass Medical Correctional Health*, 2011 WL 841248, at *1–2 (D. Mass. 2011) (holding that "where service of process of the original complaint has not been effected properly [plaintiffs] may not use Rule 5 to effect service of process of an amended complaint as a means to circumvent Rule 4's requirements concerning service" and noting that "[t]o hold otherwise would eviscerate the detailed requirements under Rule 4 for noticing defendants of claims against them"); *see also Morrissey v. Massachusetts*, 2022 WL 1463051, at *5 (D. Mass. 2022) (holding same).

With respect to Hax Holmes, it also does not appear that plaintiff complied with any of the available methods under Rule 4(e).  Defendants state that she was "improperly served at 152 Plympton Street, Waltham, Massachusetts, an address where she has not lived since March 2020."  (ECF No. 33, 24).  Since then, she has been a resident of New Hampshire who "has a New Hampshire driver's license, has voted in New Hampshire and filed taxes as a New Hampshire resident."  (*Id.*).  Plaintiff has not contested that she did not reside at the Waltham address at the time she was purportedly served.

Indeed, plaintiff does not contest that service on the five individuals did not comply with Rule 4.  Instead, it claims that the "unproven defects were [not] prejudicial," as defendants have been "actively involved in this case, fully defending their position and arguing against Plaintiff's pleadings and motions."  (ECF No. 37, 23-34).  Defendants, however, have not "waive[d] [their] right to move for dismissal based on improper service by filing a motion to dismiss," the first responsive pleading that they filed with the court.  *Thomas v. Brasher-Cunningham*, 2020 WL 4284564, at *13 (D. Conn. July 27, 2020); *cf. Farm Credit Bank of Baltimore v. Ferrera–Goitia*, 316 F.3d 62, 68 (1st Cir. 2003) (citing Fed. R. Civ. P. 12(h)(1)) (noting that it is black-letter law that "a defense based on personal jurisdiction will be deemed waived if *not* made by a party's first-filed motion or included in her initial responsive pleading") (emphasis added).  Because plaintiff failed to serve defendants within the required 90-day period, it must show good cause for failing to complete service within the deadline in order to avoid dismissal.

When a plaintiff has failed to serve process, "the burden of demonstrating the requisite good cause rest[s] upon [him]."  *United States v. Ayer*, 857 F.2d 881, 884–85 (1st Cir.1988).

> [G]ood cause is likely (but not always) to be found when the plaintiff's failure to complete service in timely fashion is a result of a third person['s actions], typically the process server, the defendant has evaded service of the process or engaged in misleading conduct, the plaintiff has acted diligently in trying to effect

19

ADD19

> service or there are understandable mitigating circumstance, or the plaintiff is
> proceeding pro se or in forma pauperis. Pro se status or any of the other listed
> explanations for a failure to make timely service, however, is not automatically
> enough to constitute good cause for purposes of Rule 4(m).

*McIsaac v. Ford*, 193 F.Supp.2d 382, 383 (D. Mass. 2002) (quoting Alan Wright & Arthur

Miller, Federal Practice and Procedure § 1137 (3d ed. 2002)); *see Martello v. United* States, 133

F.Supp.3d 338, 345 (D. Mass. 2015) (concluding that plaintiff failed to establish good cause

because he was not proceeding pro se and did not show diligence in attempting to effect service;

however, exercising discretion to grant extension because case would effectively be dismissed

with prejudice due to running of statute of limitations).

Plaintiff has not demonstrated good cause for the failure to effect service here.  There are

no allegations, for example, that the failure was caused by a third person or that defendants

evaded service.  Moreover, plaintiff has not acted diligently in trying to effect service.  To the

contrary, "the City put the Plaintiff on notice of insufficient service in its original Motion to

Dismiss, which was filed on April 24, 2023, more than six months ago," but plaintiff still took no

action.  (ECF No. 33, 25).  And plaintiff is not proceeding *pro se*.  Therefore, the complaint

against these defendants is subject to dismissal for insufficient service of process.

In any event, and for the following reasons, even if plaintiff had effected proper service

of process, Counts 2 and 3 would still be dismissed for failure to state a claim upon which relief

can be granted.

### 2.   Claim for Violation of Massachusetts Civil Rights Act (Count 2)

Under Count 2, plaintiff alleges that the individual defendants "since April 30, 2021, and

continuing thereafter throughout 2022 . . . have interfered with Plaintiff's exercise of its property

rights, secured by the U.S. Constitution and Massachusetts Declaration of Rights."  (FAC ¶ 228).

Plaintiff further contends that "Defendants' interference with Plaintiff's property rights has

20

occurred with threats, intimidation, and coercion," particularly through the "filing of a retaliatory criminal complaint." (*Id.* at ¶ 230). Finally, plaintiff alleges that the defendants "knew or should have known that their conduct was unlawful and/or would violate the Plaintiff's [constitutional] rights." (*Id.* at ¶ 234).

To establish a claim under the MCRA, a plaintiff "must prove that (1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Bally v. Northeastern Univ.*, 403 Mass. 713, 717 (1989) (quoting Mass. Gen. Laws. ch. 12, § H).  A threat is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994). Intimidation "involves putting in fear for the purpose of compelling or deterring conduct." *Id.* And coercion is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Id.* (quoting *Deas v. Dempsey*, 403 Mass. 468, 471 (1988)).  Massachusetts courts apply an objective "reasonable person" standard to determine whether conduct constitutes threats, intimidation, or coercion. *Haufler v. Zotos*, 446 Mass. 489, 505 (2006).

The complaint asserts a claim under the MCRA against six government officials in their individual capacities:  Fuller, Cornelius, Dimond, Hax Holmes, Ciccariello, and Lojek.  (*See generally* FAC).  Qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, the court must determine (1) whether the facts

21

alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009).  Furthermore, "a plaintiff must plead that *each* Government-official defendant, through the official's *own individual actions*, has violated the Constitution" in order to survive a motion not dismiss.  *Iqbal*, 556 U.S. at 676 (emphasis added).

Here, the individual defendants are clearly entitled to qualified immunity.  First, the complaint does not make out a violation of a constitutional right, as the allegations are insufficient to state a claim for a regulatory taking.[6]  Second, even assuming a valid claim for violation of constitutional right, the right at issue was not clearly established at the time of the defendants' alleged misconduct.  It "cannot be said that . . . city officials would have understood that their actions" in denying a building permit would deprive plaintiffs of their property rights, given the "First Circuit's long-standing reluctance to find constitutional violations in the land-use and zoning context."  *Martone Place, LLC v. City of Springfield*, 2017 WL 5889222, at *21 (D. Mass. Nov. 29, 2017), *aff'd*,  2018 WL 11231884 (1st Cir. Dec. 19, 2018).

Accordingly, Count 2 will be dismissed as to all defendants on the basis of qualified immunity.

### 3.  Claim for Tortious Interference with Prospective Advantage (Count 3)

In Count 3, the complaint alleges that the individual defendants knew that plaintiff was a "developer intending to construct and sell the Property to a future homeowner."  (FAC ¶ 237).  It

---

[6] Moreover, the complaint does not plead that *each* defendant through the official's own individual actions violated plaintiff's constitutional rights.  Defendant Ciccariello, for example, is mentioned in the complaint only once as being the recipient of an e-mail from Hax Holmes on April 29, 2021.  (FAC ¶ 66).  Similarly, defendant Fuller is simply alleged to have "corresponde[d] with citizens of Newton regarding their outrage about the Property."  (FAC ¶¶ 126).

further alleges that "Defendants hatched a strategy to interfere with the Plaintiff's prospective business advantage(s) by making it impossible for Plaintiff to obtain approvals on the Project through a 'move-the-goal-post' strategy and by otherwise stringing the Plaintiff along until such a time that Defendants would be able to take the Property for the City without any fair compensation." (*Id*. ¶ 240).   In doing so, according to the complaint, defendants acted "intentionally, in bad faith, with malice and with corruption." (*Id*. ¶ 246).  As a result, defendants "deprived Plaintiff of at least two . . . discrete opportunities to profitably dispose of the Property." (*Id*. ¶ 244).

Defendants contend that the individual defendants are protected by common-law discretionary-function immunity.  Under Massachusetts common law, government employees exercising judgment and discretion as public officials and in good faith are immune from suit. *See Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 145-46 (1st Cir. 2016) (affirming dismissal of intentional tort claims and explaining that "a public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption") (citations omitted).

Here, the complaint does not allege that Fuller, Cornelius, Dimond, Hax Holmes, Ciccariello, or Lojek acted at any time outside of their official capacity.  Instead, the complaint "exclusively recounts actions the City Officials took in the exercise of their duties as City employees, in the performance of their typical job duties:  The Mayor communicated with the public, the Commissioner of Inspectional Services and his Deputy enforced the City's laws regarding landmarked properties, an employee of the Planning Department assisted the NHC in discharging its official duties, and the individual members of the NHC performed their standard role as voting members of a local body making discretionary land use decisions."  (ECF No. 33,

23

12); *see also Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 398 (1996) (noting that council members act in their official capacity when making discretionary decisions concerning permit applications).

Furthermore, the complaint does not allege plausible facts sufficient to overcome the presumption that the defendants were acting in good faith in carrying out their official duties. *See Najas Realty*, 821 F.3d at 146 (noting that "[t]here is every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare") (quoting *S. Bos. Betterment Trust Corp. v. Bos. Redev. Auth.*, 438 Mass. 57, 69 (2002)). Instead, it merely alleges, in conclusory terms, that the defendants at all times "acted intentionally, in bad faith, with malice and with corruption." (FAC ¶ 246). That is not sufficient to state a plausible claim. The complaint therefore fails to state a claim of tortious interference against the defendants in their individual capacity.

Even if the individual defendants were not entitled to discretionary-function immunity, the claim would still fail. To state a claim for tortious interference with a contract or business relationship, a complaint must allege "(1) the existence of a contract or business relationship which contemplated economic benefit; (2) the defendant['s] knowledge of the contract or business relationship; (3) the defendant['s] intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages." *Swansen Dev. Corp. v. City of Taunton*, 423 Mass. 390, 338 (1996).

While the complaint identifies at least two opportunities that plaintiff had to "profitably dispose of the Property," it makes no allegation that the individual defendants knew of those potential sales. The complaint does not plead any facts to suggest that the defendants were "aware of a specific buyer, contract, negotiation or plans for sale." (ECF No. 33, 18). Instead, it

ADD24

merely alleges that "Defendants knew that Plaintiff was a developer intending to construct and sell the Property to a future homeowner." (FAC ¶ 237). Plaintiff cannot sustain a claim of tortious interference on that basis. It is not sufficient for plaintiff to claim that it is a developer who generally sought to develop the property for re-sale. *See Katin v. Nat'l Real Estate Info. Services, Inc.*, 2009 WL 929554, at *8 (D. Mass. March 31, 2009) (dismissing a claim for tortious interference where plaintiff alleged "general efforts to compete for prospective customers in the market at large"). And it is not sufficient for plaintiff to claim that defendants interfered with a contract or business relationship without showing that defendant had knowledge of the specific relationship. *See Fisher v. Stiglitz*, 302 F. Supp. 3d 457, 460 (2018) (dismissing a claim for tortious interference where "Plaintiff does not allege whether Defendants were aware of his customers, nor does he specify the opportunity that was lost, whether the Defendants were *aware of specific opportunity*, or that they employed improper means to interfere with that opportunity") (emphasis added).

Count 3 will therefore be dismissed as to all defendants.

### C.     Claim for Violation of the Eighth Amendment (Count 4)

Count 4 alleges that the City of Newton and the Newton Historical Commission violated the Excessive Fines Clause of the Eighth Amendment to the United States Constitution by "impos[ing] daily fees against Plaintiff that approximate or exceed . . . $270,000 . . . to date." (FAC ¶ 250). In particular, plaintiff contends that because its "conduct giving rise to the purported violation did not cause harm or otherwise threaten the public good," the fine at issue is "grossly disproportionate to any impact caused by the Plaintiff's conduct." (*Id.* at ¶ 253-54). Moreover, the fine "is designed to punish Plaintiff and serves no legitimate public interest." (*Id.* at ¶ 255). Defendants contend that plaintiff's claim "should be dismissed as unripe" because "a specific penalty has not been assessed against the Plaintiff with any finality." (ECF No. 33, 21-

25

22).

The ripeness doctrine is intended to "prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). To be ripe, a complaint must "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of the judicial relief sought." *Reddy*, 845 F.3d at 500 (quotation marks and citations omitted).

Courts have held that "challenges under the Excessive Fines Clause are . . . generally not ripe until the actual, or impending, imposition of the challenged fine." *United States v. Emerson*, 107 F.3d 77, 80 n. 5 (1st Cir. 1997) (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995)); *see also United States v. Paul Revere Transp., LLC*, 608 F. Supp. 2d 175 (D. Mass. 2009) (denying a pre-enforcement challenge under the Eighth Amendment Excessive Fines Clause as unripe). Until that time, plaintiff's allegations "amount to mere speculation about contingent future events." *Reno*, 55 F.3d at 1524.

Here, it is true that the complaint alleges that the NHC "voted in favor of imposing a daily fine of $300 against Plaintiff beginning on April 30, 2021." (FAC ¶ 84). The city, however, also initiated a criminal complaint against plaintiff to recover those fines. (*Id.* at ¶ 257). As defendants note, "that matter is still pending, and the parties do not yet have a trial date." (ECF No. 33, 22). At trial, the City of Newton would "have to prove to the [Newton] District Court that it is entitled to collect the accrued fines before Plaintiff is ordered to pay any sum." (*Id.*). Until that time, there has been no "determin[ation] whether the City can collect the fines, and in what amount." (*Id.*). Indeed, on March 1, 2024, defendants at the hearing on their

26

ADD26

motion to dismiss acknowledged:  "The [Newton District] Court will make the final

determination regarding what fines are and are not due and issue an order requiring payment or,

frankly, nonpayment, saying that there is no fine due here.  And that's completely within the

Court's discretion.  As I've stated, obviously the City is advancing its legal position that fines are

due, but that's not equivalent to a final order to pay a fine."  (Mot. Hr'g Tr. March 1, 2024).

As a result, this Court "cannot determine . . . what penalties will actually be imposed."

*Reno*, 55 F.3d at 1524.  Instead, "[it] can only speculate as to . . . [what] will come to pass."  *Id.*

Accordingly, any Eighth Amendment "inquiry is better postponed until the issues are presented

in . . . more concrete circumstances."  *Id.*  Defendants' motion to dismiss as to plaintiff's Eighth

Amendment claim will therefore be granted for lack of ripeness.

**IV.** **Conclusion**

For the foregoing reasons, defendants' motion to dismiss the amended complaint is

GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated:  April 30, 2024

27

ADD27

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

**29 Greenwood, LLC**

       Plaintiff

                                                     CIVIL ACTION

       V.

                                                     NO.  1:23-10800-FDS

**City of Newton et al**

       Defendant

# ORDER OF DISMISSAL

<u>Saylor, C. J.</u>

In accordance with the Court's MEMORANDUM AND ORDER dated April 30, 2024 (Dkt. No. 46), it is hereby ORDERED that the above-entitled action be and hereby is DISMISSED.

                                         By the Court,

    4/30/2024                               /s/ Flaviana de Oliveira
    Date                                         Deputy Clerk

ADD28